Dr. Lakshmi Arunachalam
222 Stanford Avenue
Menlo Park, CA 94025
Telephone: (650) 690-0995
Facsimile: (650) 854-3393
Email: laks22002@yahoo.com
*Pro Se Plaintiff*
*Dr. Lakshmi Arunachalam*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **DR. LAKSHMI ARUNACHALAM,**<br><br>**Plaintiff,**<br><br>v.<br><br>**INTERNATIONAL BUSINESS MACHINES CORPORATION, SAP AMERICA, INC., J.P. MORGAN CHASE AND COMPANY, HON. RICHARD G. ANDREWS, AND DOES 1-100,**<br><br>**Defendants.** | **C.A. No. <u>1:16-cv-281-RGA</u>**<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**18 U. S. C. 1961 et seq.;**<br>**18 U. S. C. 1964**<br>**(Civil RICO Remedies);** |

## FIRST AMENDED COMPLAINT

## <u>INTRODUCTION</u>

*Pro Se* Plaintiff Dr. Lakshmi Arunachalam (hereafter "Dr. Arunachalam") hereby files this first amended complaint. This is a complex civil action for RICO remedies authorized by the federal statutes at 18 U. S. C. 1961 et seq.; for declaratory and injunctive relief; for actual, consequential and exemplary damages; and for all other relief which this Court deems just and proper under all circumstances which have occasioned this first amended complaint. See 18 U. S. C. §§ 1964 (a) and (c) ("Civil RICO"). This first amended complaint is for patent infringement of Plaintiff's U.S. 7,340,506 Patent/US 7,340,506 C1 ("the '506 patent") against International

Business Machines Corporation ("IBM") and a verified complaint for declaratory and injunctive relief and damages from racketeering, conspiracy to engage in a pattern of racketeering activity and related claims against all the Defendants, namely, IBM, SAP America, Inc. ("SAP"), J. P. Morgan Chase and Company ("JPMorgan"), Hon. Richard G. Andrews and DOES 1-100. .

The primary cause of this action is a widespread criminal enterprise engaged in a *pattern of racketeering activity* across State lines, and a conspiracy to engage in *racketeering activity* involving numerous RICO predicate acts during at least the past ten (10) calendar years.

The predicate acts alleged here cluster around patent infringement, trafficking in certain goods bearing counterfeit marks, tampering with a Federal Witness, interstate transportation of stolen property and obstruction of justice. See 18 U. S. C. §§ 2319, 2320, 1512, 1513, 2315, 1503, 1510, 1511 and 1581-1588 respectively.

Other RICO predicate acts, although *appearing* to be isolated events, were actually part of the overall conspiracy and *pattern of racketeering activity* alleged herein. See 18 U.S.C. §§ 1341 and 1344, respectively.

The primary objective of the racketeering *enterprise* has been to inflict severe and sustained economic hardship upon Plaintiff, with the intent of impairing, obstructing, preventing and discouraging Plaintiff from writing, publishing, investigating and conducting judicial activism as the inventor of valid patents and inventions of Web applications on a Web browser.

Dr. Arunachalam alleges upon information and belief as follows:

**PARTIES**

1. Plaintiff Dr. Arunachalam, residing at 222 Stanford Avenue, Menlo Park, California 94025, is the inventor and assignee of the Plaintiff's U.S. 7,340,506 Patent/US 7,340,506 C1 ("the '506 patent"), the patent asserted here.

2.    Having a priority date of 1995, the '506 patent discloses the fundamental technology underlying Web applications displayed on a Web browser, that are reflected in the Defendant IBM's accused systems.

3.    Having a priority date of 1995, the '506 patent discloses the fundamental technology underlying Web commerce and other Web applications displayed on a Web browser. The examples of the pioneering technology in the patent were directed to Web banking, payroll processing and financial and other services on the Web which are the same as in the Defendant IBM's accused systems. The patent pioneered interactive Web applications. The priority application, Provisional Patent Application with S/N, 60/006,634, was the first to disclose a Web application displayed on a Web browser/Web page and providing a value-added network service over the Web for connecting a Web client to a provider's (e.g. Web merchant) services, as opposed to the then state-of-the-art's reliance on CGI scripting and hyperlinks. Thus, the patent discloses the fundamental technology underlying Web commerce and other online services by use of Web applications displayed on a Web page/Web browser.

4.    Upon information and belief, defendant International Business Machines Corporation ("IBM") is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 1 New Orchard Road, Armonk, New York 10504. IBM is registered to do business in Delaware and has a registered agent for service located at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. IBM resides in this judicial district and transacts business throughout the State of Delaware, including this judicial district.

5.    Upon information and belief, defendant SAP AMERICA, INC., ("SAP") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business

at 3999 West Chester Pike, Newtown Square, Pennsylvania. SAP is registered to do business in Delaware and has a registered agent for service located at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. SAP resides in this judicial district and transacts business throughout the State of Delaware, including this judicial district.

6.     Upon information and belief, defendant J.P. Morgan Chase and Company ("JPMorgan") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 270 Park Avenue, New York, New York and has a registered agent for service located at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. JPMorgan resides in this judicial district and transacts business throughout the State of Delaware, including this judicial district. JPMorgan serves millions of customers in the U.S. and many of the world's most prominent corporate, institutional and government clients.

7.     Upon information and belief, defendant Hon. Richard G. Andrews ("Andrews") is a federal judge in the U.S. District Court for the District of Delaware and has an address at 844 N. King Street, Wilmington, DE 19801. Andrews resides in this judicial district and transacts business throughout the State of Delaware, including this judicial district. On May 11, 2011, President Obama nominated Andrews to a seat on the U.S. District Court for the District of Delaware, to fill the vacancy created when Judge Joseph J. Farnan Jr. retired on July 31, 2010. On September 8, 2011, the Senate Judiciary Committee reported his nomination to the Senate floor by voice vote. On November 3, 2011, the Senate confirmed Andrews by unanimous consent. He received his commission on November 7, 2011. Judge Andrews was a former State prosecutor for the state of Delaware and a former Assistant United States Attorney for the District of Delaware.

8.     Defendants IBM, SAP and JPMorgan are using Plaintiff's patented Web applications on a Web browser. Plaintiff's patented technology has created the millennial generation and transformed the way we live, work and play and is mission critical to how IBM, SAP and JPMorgan conduct their business and operations today on the Web.

9.     Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as DOES 1 through 100, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of DOES 1 through 100, inclusive, when Plaintiff ascertains the identity of such Defendants. Plaintiff is informed and believes, and thereon alleges, that each of these Defendants is responsible in some manner for the acts and omissions which damaged Plaintiff, and that Plaintiff's damages as alleged herein were proximately caused by their actions or omissions.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction pursuant to the civil RICO remedies at 18 U.S.C. 1964 against <u>all</u> the Defendants. This is an action for patent infringement by IBM of Plaintiff's '506 patent" under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

11.     This Court has personal jurisdiction over IBM because IBM has established minimum contacts with the forum and because of its presence and business activities within this judicial district. IBM has transacted business and committed acts of infringement within the State of Delaware and within this District, and is subject to the personal jurisdiction of this Court. IBM is a corporation organized and existing under the laws of the State of New York. IBM is registered to do business in Delaware and has a registered agent for service located at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. IBM

resides in this judicial district and transacts business throughout the State of Delaware, including this judicial district. The Court has personal jurisdiction over IBM, which has purposefully availed itself of the privileges of conducting business in the State of Delaware and has sought the protection and benefits of the laws of the State; and regularly conducts business within the State of Delaware; and Plaintiff's cause of action arises directly from IBM's business contacts and other activities in the State of Delaware. IBM has placed and continues to place products used to practice Dr. Arunachalam's patented methods and systems (identified below) into the stream of commerce, which stream is directed at this district, and knows or should know that such products are used throughout the United States, including in this district.

12.     Upon information and belief, IBM is subject to the personal jurisdiction of this Court and is amenable to service of process pursuant to the Delaware long-arm statute, 10 Del. C. § 3104 and Fed. R. Civ. P. 4 (e).

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1400(b).

14.     This Court has personal jurisdiction over SAP because SAP has established minimum contacts with the forum and because of its presence and business activities within this judicial district. SAP has transacted business and committed the accused acts within the State of Delaware and within this District, and is subject to the personal jurisdiction of this Court. SAP is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 3999 West Chester Pike, Newtown Square, Pennsylvania.  SAP has a registered agent for service located at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. SAP resides in this judicial district and transacts business throughout the State of Delaware, including this judicial district. The Court has personal

jurisdiction over SAP, which has purposefully availed itself of the privileges of conducting business in the State of Delaware and has sought the protection and benefits of the laws of the State; and regularly conducts business within the State of Delaware; and Plaintiff's cause of action arises directly from SAP's business contacts and other activities in the State of Delaware. SAP has placed and continues to place products used to practice Dr. Arunachalam's patented methods and systems (identified below) into the stream of commerce, which stream is directed at this district, and knows or should know that such products are used throughout the United States, including in this district.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1400(b).

16.     This Court has personal jurisdiction over JPMorgan because JPMorgan has established minimum contacts with the forum and because of its presence and business activities within this judicial district. JPMorgan has transacted business and committed the accused acts within the State of Delaware and within this District, and is subject to the personal jurisdiction of this Court. JPMorgan is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 270 Park Avenue, New York, New York and has a registered agent for service located at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. JPMorgan resides in this judicial district and transacts business throughout the State of Delaware, including this judicial district. The Court has personal jurisdiction over JPMorgan, which has purposefully availed itself of the privileges of conducting business in the State of Delaware and has sought the protection and benefits of the laws of the State; and regularly conducts business within the State of Delaware; and Plaintiff's cause of action arises directly from JPMorgan's business contacts and other activities in the State of Delaware.

JPMorgan has placed and continues to place products used to practice Dr. Arunachalam's patented methods and systems (identified below) into the stream of commerce, which stream is directed at this district, and knows or should know that such products are used throughout the United States, including in this district.

17.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1400(b).

18.    This Court has personal jurisdiction over Hon. Richard G. Andrews because Andrews has established minimum contacts with the forum and because of his presence and business activities within this judicial district. Andrews has transacted business and committed the accused acts within the State of Delaware and within this District, and is subject to the personal jurisdiction of this Court. Andrews is a federal judge in the U.S. District Court for the District of Delaware and has an address at 844 N. King Street, Wilmington, DE 19801. Andrews resides in this judicial district and transacts business throughout the State of Delaware, including this judicial district. The Court has personal jurisdiction over Andrews, who has purposefully availed himself of the privileges of conducting business in the State of Delaware and has sought the protection and benefits of the laws of the State; and regularly conducts business within the State of Delaware; and Plaintiff's cause of action arises directly from Andrews' business contacts and other activities in the State of Delaware.

19.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1400(b).

## BACKGROUND

20.    On March 4, 2008, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,340,506 ("the '506 Patent"), entitled "Value- Added Network Switching and

Object Routing A Network," to Dr. Lakshmi Arunachalam's company, WebXchange, Inc, in which she is the majority shareholder with 100% voting rights. Dr. Arunachalam is the assignee of all rights, title, and interest in the '506 Patent, including the right to recover damages for past infringement. A copy of the '506 Patent is attached to the Complaint as Exhibit A1.

21. Patent 7,340,506 underwent a pre-AIA inter-partes re-examination, Control No. 95/001,129, by the United States Patent and Trademark Office, in which the Third Party Requester was Microsoft. Two claims emerged successfully out of the re-examination and the inter-partes reexamination certificate US 7,340,506 C1 was issued under 35 U.S.C. 316 on October 15, 2014. A copy of the inter-partes reexamination certificate issued is attached to the Complaint as Exhibit B1. The '506 patent is presumed to be, and is valid and enforceable. The defendant IBM is not licensed under the '506 patent, nor is SAP or JPMorgan.

22. Upon information and belief, IBM has infringed and is continuing to infringe and contributorily infringes and/or induces others to infringe, one or more claims of the '506 patent by engaging in acts constituting infringement under 35 U.S.C. § 271, included but not limited to practicing one or more claims of the re-examined and allowed claims, inducing others to practice one or more of the said claims, and/or contributing to another's practice of one or more of the said claims in this District and elsewhere in the United States, by means of at least IBM's WebSphere and other web application/web application development platform and tools, products and services. The very fabric of IBM runs on Plaintiff's patented inventions.

23. IBM provides web application development platform, tools, web applications, products and services, value-added network services, for example, online financial services via electronic means accessible through several web sites, which include, but are not limited to the following websites: http://www.ibm.com. Each of IBM's products and services enable Web applications, for

example, Web banking applications and other Web financial transactional features, which are exemplified, in part, by screenshots of their opening screen which displays the various value-added network services over the Web of the inventions of the patent-in-suit, such as paying bills, transfer funds between accounts, and many, many more.

24.     As reflected in the screenshots, each of IBM's and its customers' on-line (for example, financial system)  provides a plurality of value added network services over the Web,  applications displayed on a Web browser, for rendering value-added network services, for example, financial services,  practicing the claimed inventions. For example, a user of IBM's system may choose to transfer assets between checking and savings accounts, or transfer assets to third-parties by using the application displayed on a Web browser/Web page.

25.     IBM  makes, uses and sells, *inter alia*, at least WebSphere and its associated programs, and Web application products and services, which comprise the claimed inventions and operates without authority one or more apparatus,  reflected in at least the websites cited above,  wherein the first computer system offering the value-added network service comprising access to employee payroll information over the Web.

26.     IBM makes and uses value-added network services, which are practiced using the claimed inventions. Hereafter, the word "Service" refers to applications offered as value-added network services provided by online service portals, including at least those listed above. These sites and Services can be accessed from stationary personal computers or from mobile devices such as laptop computers, smartphones and tablets. Upon accessing these sites, IBM's clients or customers and their customers can, for example, view and service accounts; make transfers; pay and manage bills online using Bill Pay ("Bill Pay") which allows users to schedule bill payments through the Service; initiate and monitor Wire Transfer service; and make and manage investments through,

for example, the brokerage services, including trading securities. Through IBM's customers' Mobile Banking websites and mobile apps, the customers or clients of IBM's customers can access their accounts, transfer funds, pay bills, place and track brokerage trades, and locate ATMs via mobile devices.

## COUNT I: INFRINGEMENT OF THE '506 PATENT BY IBM

27.     Dr. Arunachalam incorporates and re-alleges paragraphs 1-26.

28.     Upon information and belief, IBM has directly infringed and is continuing to infringe one or more claims of the '506 Patent by operating without authority one or more apparatus, reflected in the websites cited above, wherein the transaction is handed over to an exchange, wherein the exchange manages the connection between the user and the online service operating across the digital network, which offers value-added network services atop the Web. IBM operates without authority one or more apparatus, reflected in at least the websites cited above, wherein the first computer system offering the value-added network service comprising access to employee payroll information over the Web. Specifically, IBM infringed and infringes, because (i) it operated and continues to operate applications and software including, but not limited to, those maintained on servers located in and/or accessible from the United States under the United States/IBM's' control that, as reflected in the website, *inter alia*, provide an apparatus for providing a service over a digital network, the apparatus comprising:

a processor;

a machine-readable storage device including one or more instructions executable by the processor for sending first display information from a first computer system to a user device, wherein the first display information includes a control associated with a commercial service;

accepting a first signal in response to a user input to activate the control; and

initiating, in response to the first signal, communication between the user device and a second computer system, wherein the second computer system acts to send second display information to the user device, wherein the second display information includes a list of at least one commercial service; wherein the second computer system further acts to accept a second signal in response to a user input to select a commercial service from the list; and to complete a commercial transaction relating to the selected commercial service;

associating an object identity with information entries and attributes, wherein the object identity represents a networked object;

storing said information entries and said attributes in a virtual information store; and

assigning a unique network address to said object identity,

wherein (a) the transaction is handed over to an exchange, wherein the exchange manages the connection between the user and the commercial service, wherein the commercial service is an online service operating across the digital network, wherein the digital network is a value-added service network atop the Web, (ii) the first computer system offering the commercial service comprising access to employee payroll information on a value-added service network atop the Web, and (iii) utilized and is utilizing computer equipment, including, without limitation, computer equipment that stores, serves, and/or runs the foregoing.

29.     IBM's infringement is by making, using and selling without authority WebSphere and other Web application development platforms, tools, Web applications, products and services, and by making and using IBM Cloud Services. IBM's infringement has injured Plaintiff. Accordingly, Plaintiff is entitled to recover damages adequate to compensate it for such infringement, but in no event less than a reasonable royalty, and an injunction to prohibit further infringement of the '506 Patent or future compensation for use of the inventions.

30.     IBM has directly infringed and is continuing to infringe one or more claims of the '506 Patent by operating without authority one or more online and mobile banking systems providing Services which utilize the patented inventions.

31.     Upon information and belief, IBM has infringed and is continuing to infringe one or more claims of the '506 patent in this District and elsewhere in the United States by practicing one or more of the claims of the '506 patent, by means of at least the IBM WebSphere and other Web application development tools, platforms and Web application products and services.

32.     IBM's online practices of the patented inventions are reflected in, but not limited to, the websites http://www.ibm.com and the websites of IBM's customers.  IBM's servers providing the claimed apparatus are located in the United States under IBM's control.

33.     Upon information and belief, IBM is contributing to the infringement of the '506 patent by others in this District and elsewhere in the United States by contributing to another's practice of one or more of the claims of the '506 patent. The direct infringement occurs by activities of the end users of at least IBM's Web application products and services.

34.     Upon information and belief, IBM is inducing  the infringement of the '506 patent by others in this District and elsewhere in the United States by inducing others to  practice one or more of the claims of the '506 patent. The direct infringement occurs by activities of the end users of at least IBM's Web application products and services.

35.     Upon information and belief, IBM, in its practicing one or more claims of the '506 patent, its inducing others to practice one or more claims of the '506 patent, and/or its contributing to another's practice of one or more claims of the '506 patent, is acting despite an objectively high likelihood that its actions constitute infringement of the '506 patent.  Thus, at least IBM's ongoing infringement of the '506 patent after notice of this Complaint is willful.

36. Upon information and belief, IBM's infringement of the '506 patent will continue unless enjoined by this Court.

37. As a direct and proximate consequence of IBM's infringement of the '506 patent, Dr. Arunachalam has suffered and will continue to suffer irreparable injury and damages, in an amount to be determined at trial, for which Dr. Arunachalam is entitled to relief.

38. Upon information and belief, IBM's infringement of the '506 patent is exceptional and entitles Dr. Arunachalam to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT II: CIVIL RACKETEERING BY IBM, SAP, JPMORGAN, ANDREWS AND DOES 1-100

### PARTIAL LIST OF RICO PREDICATE ACTS

39. Particular attention of this Court is now drawn to Exhibits A2, C1, D1, D2 and L and to the legislative history of the Anticounterfeiting Consumer Protection Act of 1996 ("ACPA"), available from the House Congressional Record dated June 4, 1996, 110 Stat. 1386, July 2, 1996.

40. The ACPA is particularly relevant to the instant case, because it elevated copyright and trademark infringement to the status of RICO predicate acts, and cited superb reasons for doing so. An excellent discussion of the legal implications of the ACPA, in the context of other applicable federal laws, are available at LETTER TO JON MUMMOLO, *Washington Square News*, Nov. 9, 2002.

41. Exhibit A2 provides a partial list of RICO Predicate Acts by IBM, SAP, JPMorgan and Andrews and additional background. Exhibit C1 is a partial list of Documented Retaliations which Plaintiff had suffered *prior* to the date on which this federal case was first filed (April 18, 2016.) Exhibit D1 is a subset of those Documented Retaliations which also qualify as one or more of the RICO Predicate Acts that are itemized at 18 U. S. C. §§ 1961(1)(B), (1)(D), and (5). Exhibit D2

-14-

is a true copy of the CPL Agreement of Eclipse code, which shows IBM-SAP collusion from the Eclipse website. Exhibit L provides a partial list of RICO Predicate Acts by Andrews and a partial list of Documented Retaliations which Plaintiff had suffered *prior* to the date on which this federal case was first filed (April 18, 2016.)

42.    **Plaintiff now testifies that the partial list of acts and events now documented in Exhibits A2, C1, D1, D2 and L constitutes probable cause for granting all relief requested *infra* in the instant COMPLAINT.**

43.    Moreover, further acts and events occurred between April 1995 and May 2016 by IBM, SAP, JPMorgan and Andrews, which also qualify as RICO predicate acts that constitute *further* probable causes for all the relief requested *infra*.

44.    For example, Plaintiff herein alleges that obstruction of justice did in fact occur *whenever* Plaintiff was deprived of specific relief from the federal district courts in Wilmington, Delaware; in San Francisco, California; in the Third Circuit; the Federal Circuit and the U.S. Supreme Court.

**Acquisition and Maintenance of an Interest in and Control of an *Enterprise* Engaged in a *Pattern of Racketeering Activity*: 18 U.S.C. §§ 1961(5), 1962(b)**

45.    Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

**THE IBM ECLIPSE FOUNDATION**

46.    At various times and places partially enumerated in Plaintiff's *documentary material*, Defendants and DOES 1 -100 did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO *enterprise* of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b).

47.	During the ten (10) calendar years preceding January 31, 2016, Defendants and DOES 1 - 100 did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U. S. C. 1962(b) (Prohibited activities).

48.	Plaintiff further alleges that Defendants and DOES 1 -100 did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U. S. C. 1962(b) *supra*.

49.	Pursuant to the original Statutes at Large, the RICO laws itemized above are to be *liberally* construed by this Court. Said construction rule was never codified in Title 18 of the United States Code, however. See 84 Stat. 947, Sec. 904, Oct. 15, 1970.

50.	*Respondeat superior* (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise).

## COUNT III:

**Conduct and Participation in a RICO *Enterprise* through a *Pattern of Racketeering Activity*: 18 U. S. C. §§ 1961(5), 1962(c)**

51.	Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein. Substance prevails over form.

### THE IBM ECLIPSE FOUNDATION

52.	At various times and places partially enumerated in Plaintiff's *documentary material*, Defendants and DOES 1 -100 did associate with a RICO *enterprise* of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

53.     Likewise, Defendants and DOES 1 -100  did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering activity*, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

54.     During the ten (10) calendar years preceding January 31, 2016, Defendants and DOES 1 -100 did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U. S. C. 1962(c) (Prohibited activities).

55.     Plaintiff further alleges that Defendants and DOES 1 -100  did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U. S. C. 1962(c) *supra*.

56.     Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the original Statutes at Large, the RICO laws itemized above are to be *liberally* construed by this Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  See 84 Stat. 947, Sec. 904, Oct. 15, 1970.

57.     *Respondeat superior* (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise).

### COUNT IV:

**Conspiracy to Engage in a *Pattern of Racketeering Activity*: 18 U.S.C. §§ 1961(5), 1962(d)**

58.  Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

### THE IBM ECLIPSE FOUNDATION

59. At various times and places partially enumerated in Plaintiff's *documentary material*, Defendants and DOES 1 -100 did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(b) and (d).

60. At various times and places partially enumerated in Plaintiff's *documentary material*, Defendants and DOES 1 -100 did also conspire to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

61. During the ten (10) calendar years preceding January 31, 2016, Defendants and DOES 1 -100 did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U. S. C. 1962(d).

62. Plaintiff further alleges that Defendants and DOES 1 -100 did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of 18 U. S. C. 1962(d) (Prohibited activities *supra*).

63. Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this honorable Court. Said construction rule was never codified in Title 18 of the United States Code, however. *Respondeat superior* (as explained above).

## PRAYER FOR RELIEF

54. WHEREFORE, Plaintiff asks this Court to enter judgment against IBM and against IBM's subsidiaries, affiliates, agents, servants, employees and all persons in active concert or participation with them, in the amount of one billion dollars, based on the number of Web transactions per application displayed on a Web browser, as each of IBM's and its customers' web sites has an infinite number of applications displayed on a Web browser offered as an online

service on the Web and an infinite number of transactions from said application(s), granting the following relief:

A.    Enter judgment that IBM has infringed and continues to infringe the '506 patent;

B.    Enter judgment that the '506 patent is valid and enforceable;

C.    Enter a preliminary and permanent injunction restraining and enjoining IBM and its officers, agents, servants, employees, attorneys, and any persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, from any further manufacture, use, sales, offers to sell, or importations of any and all of the products identified above;

D.    An award of damages adequate to compensate Plaintiff for the infringement that has occurred, together with prejudgment interest from the date infringement of the '506 Patent began, based on the number of Web transactions per application displayed on a Web browser per each of IBM's and its customers' website(s), as each web site has an infinite number of applications displayed on a Web browser offered as an online service on the Web and an infinite number of transactions, totaling to at least $1 billion; for example, *one* of IBM's customers, namely, JPMorgan states on its website: "We process 50% of all U.S. ecommerce volume including Amazon and Apple transactions." and that it has 7000+ business Web applications.

E.    An award to Plaintiff of all remedies available under 35 U.S.C. § 284, up to treble damages, pre-judgment and post-judgment interest and costs and all other remedies available under 35 U.S.C. § 284;

F.    An award to Plaintiff of all remedies available under 35 U.S.C. § 285;

G.    A permanent injunction under 35 U.S.C. § 283 prohibiting further infringement of the '506 Patent, and, in the alternative, in the event injunctive relief is not granted as requested

by Plaintiff, an award of a compulsory future royalty, based on the number of Web transactions per application displayed on a Web browser per each of IBM's and its customers' web sites, as each of the IBM's and its customers' web sites has an infinite number of applications displayed on a Web browser offered as an online service on the Web and an infinite number of transactions, totaling to at least $1 billion; and

        H.     Such other and further relief as this Court or a jury may deem proper and just;

55.    **And *Wherefore***, pursuant to the statutes at 18 U. S. C. 1964(a) and (c), Plaintiff requests judgment against all Defendants and DOES 1 -100 as follows:

       **ON COUNT II:**

56.    That this Court liberally construe the RICO laws and thereby find that Defendants and DOES 1 -100, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO *enterprise* of *persons* and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U. S. C. 1962(b) (Prohibited activities).

57.    That Defendants and DOES 1-100 and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO *enterprise* of *persons*, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

58.    That Defendants and DOES 1 -100 and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined

*temporarily* during pendency of this action, and *permanently* thereafter, from committing any more

predicate acts in furtherance of the RICO *enterprise* alleged in COUNT II *supra*.

59.     That all Defendants be required to account for all gains, profits, and advantages derived

from their several acts of *racketeering activity* in violation of 18 U. S. C. 1962(b) and from all

other violation(s) of applicable State and federal law(s).

60.     That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual

damages, and for any gains, profits, or advantages attributable to all violations of 18 U. S. C.

1962(b), according to the best available proof.

61.     That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U. S. C.

1964(c), for any gains, profits, or advantages attributable to all violations of 18 U. S. C. 1962(b),

according to the best available proof.

62.     That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of

Defendants' several violations of 18 U. S. C. 1962(b), according to the best available proof.

63.     That all Defendants pay to Plaintiff her costs of the lawsuit incurred herein including, but

not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's

fees, at a minimum of $690.00 per hour worked (Plaintiff's standard professional rate at start of

this action).

64.     That all damages caused by all Defendants, and all gains, profits, and advantages derived

by all Defendants, from their several acts of racketeering in violation of 18 U. S. C. 1962(b) and

from all other violation(s) of applicable Federal, State and federal law(s), be deemed to be held in

constructive trust, legally foreign with respect to the federal zone [*sic*], for the benefit of Plaintiff,

Her heirs and assigns.

65. That Plaintiff have such other and further relief as this Court deems just and proper, under the circumstances of this action.

**ON COUNT III:**

66. That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with a RICO *enterprise* of *persons* and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law18 U. S. C. 1962(c) (Prohibited activities).

67. That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO *enterprise* through a *pattern of racketeering activity* in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) *supra*.

68. That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from associating with any RICO *enterprise* of *persons*, or of other individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

69. That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO *enterprise* through a *pattern of racketeering activity* in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) *supra*.

70. That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during

pendency of this action, and *permanently* thereafter, from committing any more predicate acts in furtherance of the RICO *enterprise* alleged in COUNT III *supra*.

71.      That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U. S. C. 1962(c) *supra* and from all other violation(s) of applicable Federal, State and federal law(s).

72.      That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U. S. C. 1962(c) *supra*, according to the best available proof.

73.      That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U. S. C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U. S. C. 1962(c) *supra*, according to the best available proof.

74.      That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U. S. C. 1962(c) *supra*, according to the best available proof.

75.      That all Defendants pay to Plaintiff Her costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at a minimum of $690.00 per hour worked (Plaintiff's standard professional rate at start of this action).

76.      That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U. S. C. 1962(c) *supra* and from all other violation(s) of applicable Federal, State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [*sic*], for the benefit of Plaintiff, Her heirs and assigns.

77.     That Plaintiff have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

**ON COUNT IV:**

78.     That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or conspired to acquire and maintain control of, a RICO *enterprise* engaged in a *pattern of racketeering activity* in violation of 18 U.S.C. §§ 1961(5), 1962(b) and (d) *supra*.

79.     That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity* in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) *supra*.

80.     That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from conspiring to acquire or maintain an interest in, or control of, any RICO *enterprise* that engages in a *pattern of racketeering activity* in violation of 18 U.S.C. §§ 1961(5), 1962 (b) and (d) *supra*.

81.     That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from conspiring to conduct, participate in, or benefit in any manner from any RICO *enterprise* through a *pattern of racketeering activity* in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) *supra*.

82.     That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during

pendency of this action, and *permanently* thereafter, from committing any more predicate acts in furtherance of the RICO *enterprise* alleged in COUNT IV *supra*.

83.     That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U. S. C. 1962(d) *supra* and from all other violation(s) of applicable State and federal law(s).

84.     That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U. S. C. 1962(d) *supra*, according to the best available proof.

85.     That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U. S. C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U. S. C. 1962(d) *supra*, according to the best available proof.

86.     That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U. S. C. 1962(d) *supra*, according to the best available proof.

87.     That all Defendants pay to Plaintiff her costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement, and all reasonable counsel's fees, at a minimum of $690.00 per hour worked (Plaintiff's standard professional rate at start of this action).

88.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(d) *supra* and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [*sic*], for the benefit of Plaintiff, Her heirs and assigns.

89.    That Plaintiff have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

### JURY DEMAND

90.    Plaintiff demands a trial by jury on all issues so triable.

91.    Pursuant to 18 U.S.C. 1961(9), Plaintiff now formally incorporates Her *documentary material* by reference to all of the following Exhibits, as if set forth fully here, to wit: Exhibits A1, B1, A2, C1, D1, D2, A – L and the Eclipse code version 2.0.1, which is available for download at www.eclipse.org, which incorporates the inventions of Dr. Arunachalam and inventions of other inventors, demonstrating a pattern of racketeering activity by Defendants.

### VERIFICATION

92.    I, Dr. Lakshmi Arunachalam, Plaintiff in the above entitled action, hereby verify under penalty of perjury, under the laws of the United States of America, that the above statement of facts and laws is true and correct, according to the best of My current information, knowledge, and belief, so help me God, pursuant to 28 U.S.C. 1746(1). See the Supremacy Clause in the Constitution for the United States of America, as lawfully amended (hereinafter "U. S. Constitution").

Dated: May 13, 2016

Signed: *Lakshmi Arunachalam*

Printed: Dr. Lakshmi Arunachalam

93.    A certificate of mailing to the Clerk of the Court, United States Federal District Court for the District of Delaware via Parcels Inc of Wilmington Delaware to deliver to the Clerk of the Court on the morning of May 13, 2016, is attached.

Dated: May 13, 2016

Respectfully submitted,

*Lakshmi Arunachalam*

Tel: 650 690 0995
laks22002@yahoo.com

Dr. Lakshmi Arunachalam
222 Stanford Ave, Menlo Park, CA 94025

*Pro Se* Plaintiff

# List of Exhibits

**Exhibit A1:** U.S. Patent No. 7,340,506

**Exhibit B1:** US 7,340,506 C1, Inter partes Re-examination Certificate

**Exhibit A2**: A partial list of RICO Predicate Acts by IBM, SAP, JPMorgan and Defendant Judge Andrews and additional background.

**Exhibit C1:** A partial list of Documented Retaliations which Plaintiff had suffered *prior* to the date on which this federal case was first filed (April 18, 2016.)

**Exhibit D1:** A subset of those Documented Retaliations which also qualify as one or more of the RICO Predicate Acts that are itemized at 18 U. S. C. §§ 1961(1)(B), (1)(D), and (5).

**Exhibit D2**: CPL Agreement of Eclipse code, which shows IBM-SAP collusion from the Eclipse website. The documents in the Exhibit are true and accurate copies of files downloaded from www.eclipse.org on April 18, 2016: 2002-08-29 Common Public License (CPL) Version 0.5 http://www.eclipse.org/legal/cpl-v05.html ; 2004-09-02 Tentative IP Log for eclipse.platform, eclipse.jdt and eclipse.pde http://www.eclipse.org/projects/ip_log.php?projectid=eclipse.platform,eclipse.jdt,eclipse.pde ; and 2004-09-02 Eclipse CPL to EPL Transition Plan http://www.eclipse.org/legal/cpl2epl/

**Exhibit D3:** A partial list of RICO Predicate Acts by Defendant Andrews and a partial list of Documented Retaliations which Plaintiff had suffered *prior* to the date on which this federal case was first filed (April 18, 2016.)

**Exhibit A:** Judge William Alsup's Order in Case No. C 08-05149 WHA (N. Dt. CA) on February 17, 2009.

**Exhibit B**: April 5, 2016 Federal Circuit ("CAFC") Ruling in Case 14-1562, *Cardpool, Inc. v. Plastic Jungle, Inc.*

**Exhibit C**: Mandate issued on July 24, 2015 in CAFC Case No. 14-1495, *JPMorgan v. Dr. Arunachalam and Pi-Net International, Inc.*

**Exhibit D**: CAFC's Order denying *en banc* rehearing issued in June 2015 in CAFC Case No. 14-1495, *JPMorgan v. Dr. Arunachalam and Pi-Net International, Inc.*

**Exhibit E:** U.S. Supreme Court's Letter to CAFC on Order denying rehearing of Dr. Arunachalam's Petition for Writ of Certiorari in Case No. 15-691.

**Exhibit F:** Claims 14, 20 and 21 in U.S. Patent No. 7,340,506/US 7,340,506 C1.

**Exhibit G**: excerpts pp. 175-181, 189-191 of the prosecution history of the related U.S. Patent No. 6,212,556, the ('556) patent in the same priority chain as the '506 patent.

**Exhibit H:** excerpts pp 1-5 of the parent provisional patent application with S/N 60/006,634 filed November 13, 1995.

Exhibit **I:** excerpts pp 82-93 from the prosecution history of the parent U.S. Patent No. 5,778,178, the ('178) patent in the same priority chain as the '506 patent.

**Exhibit J:** is a true and correct copy of the web page for eclipse.org where Eclipse code is available for download including Plaintiff's inventions; list of members showing SAP, JPMorgan, IBM as members; board of directors showing SAP as a Board member; board meeting minutes of Dec 8, 2004 showing SAP's lead role; Eclipse awarded JPMorgan "Best Deployment of Eclipse Technology in an enterprise" at EclipseCon March 6, 2007; article entitled "JPMorgan raises the Bar for Banking Applications;" Amendment No. 8 to Form S-1 Registration statement for Facebook, Inc. showing JPMorgan, BofA, Barclays, Citigroup, Wells Fargo; and list of tutorials, sample code on Eclipse SOAP, REST, OData services from SAP.

**Exhibit K:** letter from SAP's counsel G. Lanier terrorizing Dr. Arunachalam on April 8, 2016.

**Eclipse code version 2.0.1 is available for download at www.eclipse.org.**

**Exhibit A2: A partial list of RICO Predicate Acts by IBM, SAP, JPMorgan and Defendant Andrews and additional background**

Plaintiff Dr. Lakshmi Arunachalam's U.S. Patent No. 7,340,506/US 7,340,506 C1 ("'506 patent"), with a priority date of November 13, 1995, re-emerged successfully against Microsoft from an *inter-partes* re-examination by the USPTO. Judge Alsup ruled (**Exh. A**) against Microsoft, in Dr. Arunachalam's favor in Case No. C 08-05149 WHA (N. Dt. CA) on 2/17/09: "Microsoft is using counterfeit logic to manufacture a controversy where none exists."

35 U.S.C § 282 of the Patent Act allows the presumption of validity of her '506 patent. Defendant JPMorgan did not provide clear and convincing evidence of invalidity of her patents, U.S. patent No. 5,987,500 ('500 patent), 8,037,158 ('158 patent) and 8,108,492 ('492 patent) in Case 1:12-cv-282 (D. Del) with completely different claims and specifications, different from the specification and claims of the '506 patent. SAP, Citizen's Financial Group, CitiBank, Wells Fargo Bank, JPMorgan and Kronos have not provided clear and convincing evidence of invalidity of the '506 patent.

**A.      SAP, Citizen's Financial Group, CitiBank, Wells Fargo Bank, JPMorgan and Kronos' (collectively "Delaware Defendants") arguments in 1:12-cv-355 (D. Del) are irrelevant to the facts of the '506 patent and Andrews' Ruling in the Fulton Bank case involving Plaintiff's '339 Patent is irrelevant to the Facts of the '339 Patent and contrary to April 5, 2016 Federal Circuit ("CAFC") Ruling (Exh. B) in Case 14-1562, *Cardpool, Inc. v. Plastic Jungle, Inc.* that "axed patent claims do not doom amended ones."**

CAFC held that the validity of the new claims was not examined by any Court and that the district court's prior invalidity decision on *Cardpool Inc.*'s patent 7,494,048 was based on the prior set of claims and had **no effect on the new claims** granted upon reexamination:

"district court's final judgment as to an original group of claims does not automatically render that judgment *res judicata* as to new claims granted upon reexamination."

"...*Fresenius USA, Inc. v. Baxter Int'l, Inc.,* 721 F.3d 1330, 1346 (Fed. Cir. 2013)… CAFC held…"the statute requires that a final PTO decision affirmed by this court be given effect in pending infringement cases that are not yet final, and is not affected by a subsequent final court ruling contrary to the PTO ruling. *Cardpool* Dist. Dk. 93 at 1–2

-30-

(May 29, 2014).".... PTO's issuance of the Reexamination Certificate was an interpretation or application of federal law, and must be given retroactive effect because the infringement suit was still pending on appeal. Cardpool argues that the district court erred in law, because "the controlling interpretation of federal law must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." *Id.* (quoting *Harper v. Va. Dep't of Taxation,* 509 U.S. 86, 97 (1993)). CAFC "requires that this principle "applies with equal force where the change is made by an administrative agency acting pursuant to legislative authorization." *Thorpe v. Hous. Auth.,* 393 U.S. 268, 282 (1969)." "Cardpool also criticizes the district court for "fail[ing] to consider the case under the reexamined claims." Cardpool Br. 21. Cardpool states that the <u>district court "committed legal error in not giving full effect to the reexamined amended claims</u>...and <u>by denying the motion to vacate without reconsideration of the basis in view of the amended reexamined claims." *Id.* at 22." "Cardpool...stated that "<u>if the Court is inclined to apply its prior invalidity decision to the amended reexamined claims..., such a determination must not be</u> <u>done in a cursory manner but with a full opportunity of the parties to provide briefing and argument." *Cardpool* Dist. Dk. 93 at 5–6 (May 29, 2014)."

The validity and infringement of the re-examined claims in the '506 patent or of the claims in Plaintiff's '339 patent have not been evaluated by any court. The Delaware district court's initial unpatentability ruling in another case involving a completely different set of patents and different claims do not apply on the facts involving the '506 patent with new amended claims or those involving the '339 patent, because the claims that were the subject of the prior ruling on a different set of patents were different and do not exist "in the same form."

The "final PTO judgment" on reexamination of the '506 patent was issued before "the appellate mandate (**Exh. C**) that would have finalized the interim district court decision" on the '492, '500 and '158 patents, issued on July 24, 2015 in CAFC Case No. 14-1495, *JPMorgan*, a year after the PTO issued the '506 reexamination certificate. See **Exhs. D** and **E** - CAFC and U.S. Supreme Court Denial of Rehearing.  There is no inequitable conduct or any non-disclosure, as alleged by Delaware Defendants, on the part of Dr. Arunachalam or her attorney Lawrence Goodwin, who is a highly experienced  patent lawyer.  This Court must grant Dr. Arunachalam her due process right to demonstrate that new and amended claims differ substantially from the

claims already rejected by the Court in another case involving ***different patents***. The district

court's decision was not final nor was it affirmed on appeal before the PTO's reexamination

decision. The District Court's decision was not affirmed by the CAFC, which dismissed the case

***without adjudicating on the merits of the case***. The district court's original decision is limited to

the claims and grounds that existed in that case related to the '500, '492 and '158 patents-in-suit,

not on the '506 or '339 patent. CAFC cites *"Allard v. DeLorean*, 884 F.2d464, 466 (9th Cir.

1989)."

**B. Courts must examine changed factual circumstances**: On 4/5/16, CAFC stated in 14-1562:

> "Dismissal "with prejudice" operates as *res judicata* as to the same cause of action. 747
> Am. Jur. 2d Judgments § 547. How this rule of finality would apply to changed
> circumstances depends on the factual circumstances of the specific situation. *See Lawlor
> v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327–328 (1955) ("That both suits involved
> 'essentially the same course of wrongful conduct' is not decisive" of the applicability of
> the doctrine of *res judicata* and courts must examine factual circumstances, such as, for
> example, whether "new causes of action" or "substantial changes in scope" of wrongful
> conduct exist, in determining its applicability.) Res judicata does not automatically arise
> against unknown future situations. In *Aspex*, the court applied these principles to the
> facts of that case, recognizing…If the claim did not exist at the time of the earlier action,
> it could not have been asserted in that action and is not barred by *res judicata*." 672 F.3d
> at 1342; *see also Lawlor*, 349 U.S. at 328 (a prior judgment "cannot be given the effect
> of extinguishing claims which did not even then exist and which could not possibly have
> been sued upon in the previous case"). On the facts and procedures of this case, the
> issue of validity of the reexamined claims remains to be addressed in any future
> proceeding. In the initial proceeding the original claims were adjudicated only on
> grounds of subject matter eligibility under section 101. As in *Aspex*, the effect of a prior
> judgment rendered on specific issues as applied to the original claims, depends on the
> facts and issues of the reexamination, and invokes equity as well as law. 672 F.3d at
> 1341–1346."

> "A district court's denial of a motion to vacate its judgment, Fed. R. Civ. P. 60(b), is
> reviewed on the procedural standards of the regional circuit, while any aspects of the
> motion that are unique to patent law are reviewed in accordance with Federal Circuit
> law.*Univ. of W. Va. Bd. of Trs. v. VanVoorhies*, 342 F.3d 1290, 1294 (Fed. Cir. 2003);
> *Lazare Kaplan International, Inc. v. Photoscribe Technologies, Inc.*, 714 F.3d 1289
> (Fed. Cir. 2013)…a district court's denial of a Rule 60(b) motion is reviewed for abuse
> of discretion. *United States v. Asarco Inc.*, 430 U.S. 972, 978 (9th Cir. 2005). In
> reviewing discretionary rulings, the Ninth Circuit determines whether the district court
> applied an incorrect legal rule or whether the district court's application of the law to the

facts was "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (*en banc*)…(quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 577 (1985)). The Supreme Court counsels that "vacatur must be decreed for those judgments whose review is . . . 'prevented through happenstance'—that is to say, where a controversy presented for review has 'become moot due to circumstances unattributable to any of the parties.'" *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 23 (1994) (quoting *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950)). …remand so the district court can decide whether to vacate its judgment in light of 'the consequences and attendant hardships of dismissal or refusal to dismiss' and 'the competing values of finality of judgment and right to relitigation of unreviewed disputes.'" *Dilley v. Gunn*, 64 F.3d 1365, 1370–71 (9th Cir. 1995) (quoting *Ringsby Truck Lines, Inc. v. W. Conference of Teamsters*, 686 F.2d 720, 722 (9th Cir. 1982), and stating that "*Ringsby* is wholly consistent with the 'equitable tradition of vacatur' reflected in *U.S. Bancorp*.")." (Emphasis added)

**C. The '506 patent is a completely different patent with a completely different specification and totally different claims (Exh. F) from the patents-in-suit previously asserted. A claim term cannot be construed stripped from the context of the total claim.**

The claim term in the '506 patent, "value-added service network," is definite because the boundaries of the patent protection sought are clear. Older cases should be applied with care, according to the facts of each case. Prosecution history estoppel and disclaimer prevent the Court from ruling several terms indefinite, such as "value-added service network," "service network," "value-added network switch." The District Courts' and CAFC's errors were prejudicial and willful. The Court must analyze claim terms in view of the specification from the perspective of those skilled in the relevant art since a particular term used in one patent or application may not have the same meaning when used in a different application. Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1318, 74 USPQ2d 1184, 1188 (Fed. Cir. 2005). "Value-added service network" is a term coined by the inventor, Dr. Arunachalam and can only take on that meaning ascribed to it by the inventor. The PTAB interpreted this claim term. Definiteness of claim language must be analyzed, not in a vacuum, but in light of the content of the particular application disclosure; the teachings of the prior art; and the claim interpretation that would be given by one possessing the

ordinary level of skill in the pertinent art at the time the invention was made. In reviewing a

claim for compliance with 35 U.S.C. 112(b), **the Court must consider the claim as a whole** to

determine whether the claim apprises one of ordinary skill in the art of its scope and, therefore,

serves the notice function required by 35 U.S.C. 112(b), by providing clear warning to others as

to what constitutes infringement of the patent. See Solomon v. Kimberly-Clark Corp., 216 F.3d

1372, 1379, 55 USPQ2d 1279, 1283 (Fed. Cir. 2000); In re Larsen, No. 01-1092 (Fed. Cir. May

9, 2001) (unpublished) (The preamble of the Larsen claim recited only a hanger and a loop but

the body of the claim positively recited a linear member. The court observed that the totality of

*all* the limitations of the claim and their interaction with each other must be considered to

ascertain the inventor's contribution to the art. Upon review of the claim in its entirety, the court

concluded that the claim at issue apprises one of ordinary skill in the art of its scope and,

therefore, serves the notice function required by 35 U.S.C. 112.)  Examples of claim language

which have been held to be indefinite set forth in MPEP § 2173.05(d) are fact specific and

should not be applied as per se rules. CAFC provides guidance (emphasis added):

> "The Federal Circuit's decision in *Powell v. Home Depot,* App. No. 2010-1309 (Fed. Cir. Nov 14, 2011)… reminds one "the prior art cited in the prosecution history of a patent forms part of the intrinsic evidence for claim construction purposes," *Kumar v. Ovonic Battery Co.,* 351 F.3d 1364, 1368 (Fed. Cir. 2003) (citing *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.,* 279 F.3d 1357, 1371-72 n.4 (Fed. Cir. 2002); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996))."

> "In a six-four *en banc* decision in *Lighting Ballast Control LLC v. Philips Electronics North Am. Corp.*, the Federal Circuit confirmed its practice of *de novo* claim construction review. Judge Newman stated: "Implementing the Supreme Court's decision in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) (*Markman II*), aff'g *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*) (*Markman I*), this court in *Cybor* held that patent claim construction receives *de novo* determination on appeal, that is, review for correctness as a matter of law. Such review is conducted on the administrative record and any additional information in the record of the district court, and is determined without deference to the ruling of the district court." "Given the Supreme Court guidance in *Markman II* that claim

construction is "better suited to determination by a judge rather than a jury," Judge Newman saw three options for the appropriate standard of review:

"The first, urged by Lighting Ballast, holds that "patent claim construction is most reasonably classified as a question of fact" and so should be reviewed only for clear error. The second, supported by the Solicitor General for the United States, holds that claim construction should be subject to a "hybrid of *de novo* review and deferential review," with "the factual aspects of claim construction to be reviewed on the clearly erroneous standard, while the final conclusion receives review as a matter of law." The third is that *Cybor* is a "reasonable and correct" interpretation of *Markman II*, such that the practice of *de novo* claim construction review should be maintained."

"**Judge Lourie's Concurrence**…"It would hardly promote uniformity … for us to bless a claim construction in one district court, based on that court's judging the credibility and demeanor of the expert witnesses in one case, when a different case might lead to a different result based on a different district judge's appraisal of different witnesses.
[C]laim construction is not a process that normally involves historical facts. It primarily involves reading the patent's written description as well as the prosecution history of the patent, and this court is quite as able to do that as any district court, sometimes better."

Judge O'Malley cites several law review articles for the proposition that
"[p]arties do not make claim drafting decisions based on the standard of review we apply to trial court claim constructions. Nor could they, given the panel-dependent nature of our own determinations."
"Claim construction disputes are very fact specific—patents do not follow a formulaic structure, or even contain oft repeated language. Claims are drafted, redrafted, and amended in ways intended to reflect and capture particular inventions in a particular field, to avoid very specific prior art, and to respond to the rejections of the unique patent examiner involved in the application process. It is rare that any two claims we review contain the same phrasing, and **even more rare that the context in which the phrasing is used would not alter the meaning of even almost identical words**…. Combining the uniqueness of each claim term to be reviewed with the variations in rationale employed by the divergent members of this court, provides little practical guidance regarding how any claim construction dispute might be resolved in this forum—and certainly not the uniform reliability of outcome with which the majority now credits our jurisprudence in this area…we know how to delve into the "very fact specific" record, to trace the prosecution history of a claim that was "drafted, redrafted, and amended," to understand the "particular inventions" and the distinguishing features from the "very specific prior art." It doesn't matter that the claim construction in one case is *not* likely to apply to a different case involving a different patent. What matters is that the body of case law under *Cybor* has given us a framework within which to apply the principles of claim construction in a predictable manner."

In Dr. Arunachalam's parent 6,212,556 ('556) patent prosecution history (**Exh. G**), the

inventor, Dr. Arunachalam distinguished her invention over the cited art, U.S. Patent No.

5,828,666 ("Focsaneanu"). **Delaware Defendants and Andrews omit** that prosecution history estoppel already has established that the term is not indefinite and relates to application layer network switches, not with a network layer switch; and that prior art is not only cited, but also discussed in detail in the specification of the '506 patent. The claim language, disclosure in the written description, and the meaning to persons of ordinary skill are fact specific. CAFC states:

> "cited art as intrinsic evidence for purposes of claim construction….claims should be construed in view of the prosecution history's treatment of the prior art so as to determine what the applicant gave up in obtaining allowance of the claims...When prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." *Arthur A. Collins, Inc. v. Northern Telecom Ltd,* 216 F 3d. 1042 (Fed. Cir. 2000)."

**Delaware Defendants and Andrews omit** that Dr. Arunachalam's priority provisional application S/N60/006,634 (**Exh H** pp. 4-5) distinguishes between a valued-added service network, from a facilities network, gives analogy with telephone service network, that physical poles and cables of a phone network is the facilities network, that the voice service network is the application network that delivers voice services, that voice is the value-added network service or VAN service.

> "…Web evolving as…medium for electronic commerce (EC), new value - added network (VAN) services are expected to emerge… simple telephone call is…well - known example of a value - added network service…telephone network has two different but interrelated aspects: In terms of its physical components, it is a "facilities network." In terms of the varieties of VAN services that it provides, it is a set of many "traffic networks", each representing a particular interconnection of facilities. Traffic is the flow of multi – media information through the network.…consider, for example, a simple transaction of daily commerce, such as ordering and paying for pizza, or home banking, or payroll services for businesses from banks, offered as a VAN service. The Internet, like the telecommunications network, is a system of interconnected facilities that could carry traffic from a variety of EC services. From the perspective of its physical components, the "Facilities Network" for EC exists today…There is no direct access to the end user from the VAN service providers, such as a Bank. There are some missing elements needed to capture and control the end user environment. The "Traffic Network" is THE challenge." (Exh H pp 4-5)

Ethernet cord and OSI network layer router or switch (col. 5) are examples of a facilities network, which is a TCP/IP-based (cols. 5-6) network with physical hardware components. Example of a value-added service network over the Web is a Web banking application network.

**Delaware Defendants and Andrews omit** that the specification (1) distinguished between the network layer vs application layer, (*see* cols. 4-5 and Fig. 3) which defines clearly the **metes and bounds** of what the structure is; (2) evidences that any ambiguity has been resolved by the specification disclosing a metric that distinguishes the value-added service network as an application network including the application displayed on a Web browser limitation and the distinction from a facilities network, which is a TCP/IP-based physical Internet or Web. *Halliburton Energy Servs.,* 514F.3d,1255-56,85USPQ2d,1663 "…quantitative metric (e.g…limitation as to a physical property) rather than a qualitative functional feature"); (3) provide[s] a formula for calculating a property "along with examples that meet the claim limitation and examples that do not;" (4) discloses a "value-added service network" which is an OSI layer 7 application network  that includes an application displayed on a Web browser (**providing examples** of such a "value-added service network" **meeting the claim limitation**, eg, Web banking network, that includes a Web banking application displayed on a Web browser, Figs 6A,5D, 5C)  and is distinct from a facilities network, an IP-based facilities network, which only goes up to layer 4 of the OSI model, such as the physical Internet and the Web. POSvc application is a term coined by the inventor and can only take on the meaning ascribed to it by the inventor and is not indefinite; (5) **provides examples that do not meet the claim limitation** as in cols. 5-6,  of an IP-based facilities network as in col. 5,  such as the Internet, Web... (*id.* 1256, 85 USPQ2d at 1663 (citing *Oakley, Inc. v. Sunglass Hut Int'l,* 316F.3d 1331,1341,65 USPQ2d1321,1326 (Fed. Cir. 2003)).  "Dialing into the bank via a modem line" is an example of a facilities network;

"…user **100**… **dialing into the bank via a modem line**. If user **100** is a Web user…no current mechanism for performing…real-time transaction with the bank, as illustrated in FIG. 4A … bank…unable to be a true "Web merchant," namely a **merchant capable of providing complete transactional services on the Web**." (col. 5)

(6) **provides** a general **guideline and examples sufficient** to **teach a person skilled in the art when the claim limitation was satisfied** (see *Marosi,* 710 F.2d at 803, 218 USPQ at 292);

(7) demonstrates that the **boundaries of the claim term in the claim as a whole are clear and precise**, upon primary inquiry as to whether the language leaves room for ambiguity or whether the boundaries are clear and precise.

The Delaware District Court construed "VAN service provider" as a provider of a POSvc application. The Court **must** construe "value-added service network" consistent with "VAN service provider" "value-added network" and "VAN service." PTAB (and frankly suspiciously given undisclosed litigant financial holdings by the judges) construed it as "a network on which services, other than underlying network communication services, are provided." Patent Owner ("PO") construed it as "an OSI application layer network running on top of a facilities network and that provides value-added network services (VAN services)." Prelim. Resp. 18. "**VAN Services**" are "applications displayed on a Web browser, that provides a value-add to the network," (eg, Web banking application is an example of a value-add to the network.) A "**facilities network**" is "an IP-based network with physical hardware components that provides underlying network communication services up to layer 4 of the OSI model." This construction for "service network," "Value-added Service Network" is consistent with PO's construction of VAN service provider and also the specification. PTAB construed it similarly, distinguishing between a facilities network (which provides the underlying network services from layers 1-4 of the OSI model) and a "service network," "Value-added Service Network" which provides the value-added services like Web banking, consistent with the specification (col. 6). PTAB

acknowledges that a service network includes an Exchange which <u>displays</u> a <u>Web page **505** that</u> <u>includes applications **510**</u>.  (col. 5): "Five components interact to provide this <u>service network</u> functionality, namely, <u>exchange</u>, …graphical user interface." The specification discloses that <u>a</u> <u>necessary component of a service network</u> or "Value-added Service Network" <u>is an application</u> <u>displayed on a Web browser</u> and that the service network or "Value-added Service Network" is an OSI application layer network running on top of a TCP/IP-based facilities network, such as the Web, the physical Internet, or email networks, as PTAB acknowledged. (cols. 5-6)  The service network or "Value-added Service Network" delivers VAN services or applications displayed on a Web browser. (col. 9).  PTAB acknowledged in IPR2013-00194, IPR2013-00195, CBM2013-00013 and CBM2014-00018 <u>that a service other than an underlying service is an</u> <u>application like the Bank POSvc application</u>. PTAB itself has defined what "value-add" means, that it is a "<u>service other than an underlying service is an application like the Bank POSvc</u> <u>application</u>." PTAB acknowledged what VAN services means. <u>VAN service is a term coined by</u> <u>the inventor</u>, <u>just as POSvc application is a term coined by the inventor and can only take on the</u> <u>meaning ascribed to these terms in the specification or prosecution history by the inventor</u>. Application service **704** and VAN service **704** are one and the same as disclosed in the specification. The specification at col. 2 discloses "application" or "service." So VAN services are applications displayed on a Web page or Web browser.

**D.      Delaware Defendants' and Andrews' willful omissions, obstruction of justice, allegations about Dr. Arunachalam and her patents   and terrorizing Dr. Arunachalam (Exh. K)  mask racketeering evident from SAP's founding role (2001)  in the IBM Eclipse Foundation, hijacking Dr. Arunachalam's  inventions that created the millennial generation (Exh. J: eclipse.org, members, Eclipse code which includes said inventions)**

Delaware Defendants and Andrews obstructed justice involving  multiple parties thus denying

Dr. Arunachalam a due process hearing, without giving a chance to be heard nor being given a

fair chance and due process by the Courts, using counterfeit logic to manufacture false allegations about Dr. Arunachalam and her patents that masks violation of U.S. laws and misrepresentation by individual lawyers, expert witnesses, judges, PTAB, enterprises and their employees, that has caused great personal, physical and financial injury to Dr. Arunachalam.

**SAP colluded with IBM to hijack and illegally distribute Dr. Arunachalam's invention to multiple IBM Eclipse Foundation members.** Andrews aided, abetted and colluded with them.

Dated: May 13, 2016                          Respectfully submitted,

*Lakshmi Arunachalam*

Tel: 650 690 0995                            Dr. Lakshmi Arunachalam
laks22002@yahoo.com                          222 Stanford Ave, Menlo Park, CA 94025

  *Pro Se* Plaintiff

**Exhibit C1: A partial list of Documented Retaliations which Plaintiff had suffered *prior* to the date on which this federal case was first filed (April 18, 2016.)**

- IBM and IBM's customer JPMorgan and SAP, Wells Fargo, CitiBank and Defendant Andrews have been engaged in obstruction of justice; tampering with a witness, Marvin Sirbu by SAP, and Ms. Spielman by JPMorgan; interference with commerce, robbery and extortion; racketeering (the Hobbs Act);

- IBM had a scheme to defraud and defendant IBM's knowing participation in that scheme, as evidenced by The IBM Eclipse Foundation;

- IBM had a specific intent to defraud; See **Exhibit D2**.

- SAP, JPMorgan, Wells Fargo, CitiBank, Fiserv, all of whom are members of the IBM Eclipse Foundation made false representation of material facts and made material omissions of facts; that they knew were false, that they made the material representation or omission with the intent to induce the plaintiff/judges to rely, action by the plaintiff/judges in reliance on the misrepresentation or omission, injury to the plaintiff as a result of such reliance;

- IBM and SAP and their customers, JPMorgan, CitiBank, Wells Fargo are engaged in monetary transactions in property derived from specified unlawful activity and interstate transportation of stolen property, by illegally distributing Eclipse code which includes Dr. Arunachalam's inventions, through the IBM Eclipse Foundation.

- IBM, SAP, JPMorgan and Andrews have been engaged in a pattern of racketeering activity of at least two acts of racketeering activity and the last of which occurred within ten years after the commission of a prior act of racketeering activity and with the threat of continuing activity. The factor of continuity plus relationship combines to form a pattern. This is evident from the IBM Eclipse Foundation. This conduct forms a pattern as IBM

and other members of the IBM Eclipse Foundation embrace unlawful acts that have the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events. IBM, SAP and JPMorgan have been engaged in such unlawful activity during a closed period of repeated conduct and also engaged in past conduct that by its nature projects into the future with a threat of repetition.

- The enterprise is the IBM Eclipse Foundation. The persons who committed the predicate offenses are IBM, SAP, JPMorgan, Andrews, the judges, individual lawyers, expert witnesses, and they are distinct from the "enterprise," the IBM Eclipse Foundation.

- '1961(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. The enterprise is the **IBM Eclipse Foundation**.

- IBM does not disclose where the underlying code comes from, namely, Dr. Arunachalam and Mike McKibben and Leader Technologies, Inc. of Columbus, Ohio.

18 U.S.C. "1962(a) through (d) prohibit four types of relation-ships between a pattern of racketeering activity and an enterprise.

**'1962(a)**

It shall be unlawful for any person who has received income, directly or indirectly, from a pattern of racketeering activity or to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, inter-state or foreign commerce.

- Section 1962(a) requires a nexus between the income or proceeds from the underlying criminal activity and the enterprise, for the essence of the violation is the use of the illegal income in the enterprise. **The IBM Eclipse Foundation is evidence of existence of such nexus**.

A sufficient nexus between the illicit income and the enterprise has been established with the evidence of the IBM Eclipse Foundation where:

- The deposit of income in one of the defendant's companies (in the form of bank loan proceeds which were obtained by fraud) coincided with a comparable amount earned in the enterprise.[i]

- Substantial deposits of income in the enterprise were being made at the same time that defendant was engaged in illicit activity.[ii]

**'1962 (b)**

> It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, inter-state or foreign commerce.

The majority of courts require a proprietary interest, such as ownership of stock, to establish an "interest" in an enterprise under Section 1962(b).[iii]

- Defendant who was serving as leasing agent and was a partner in a real estate venture defrauded his partners by mismanaging partnership property, allowing a co-defendant to acquire an interest in the partnership inexpensively**. The court rejected the '1962(a) claim because the "use of proceeds" element was missing, but upheld the claim under '1962(b) because the co-defendant promised that**

**the defendant would remain as leasing agent once the co-defendant acquired the property—giving the defendant a sufficient "interest" in the enterprise. Note: This case takes an expansive view of "interest."[iv]**

- '1962(b) liability was rejected in a churning case where the customer always retained the power to terminate the broker.[v]

- '1962(b) liability was upheld where an oil company injured its competitor by using undue influence to obtain oil at below market prices.[vi]

- **'1962(c)**

- It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

- '1962(c) focuses on the conduct of the defendant, IBM, not "enterprise."

**'1962(d)**

It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

- A RICO conspiracy is composed of two agreements:

    (1)    An agreement to commit at least two predicate acts which form the pattern of racketeering activity; and

    (2)    An agreement to the conduct which violates subsection (a), (b) or (c) of '1962, e.g. an agreement to conduct or participate in the affairs of an enterprise (sub-section(c)).[vii]

- A RICO conspiracy generally involves two groups of people- the conspirators and the enterprise.

- Aiding and abetting liability has been imposed where, for each alleged predicate act, the defendant was associated with the wrongful conduct, participated with the intent to bring it about, and sought by his actions to make it succeed.[viii]

**THE CIVIL CAUSE OF ACTION**

- **'1964(c)**

- Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of suit, including a reasonable attorneys' fee.

- Drawing on the Supreme Court's broad interpretation of the Commerce Clause in the U.S. Constitution, courts have held that virtually any business activity which involves the flow of goods or services in "commerce" affects interstate commerce.

- 1964(c) requires that the injury to business or property occur "by reason of" the RICO violation. **The injury to Dr. Arunachalam and her property occurred by reason of the RICO violation by IBM, Andrews and all the other Defendants.**

- **Facts of IBM's Racketeering:**

- IBM signed NDA with Dr. Arunachalam and her companies as early as April 1995, in 2001, 2003 and also later.

- IBM negotiated with Dr. Arunachalam to joint venture with her on numerous occasions between 1994 and 2011.

- IBM provided office space to Dr. Arunachalam at IBM, Sunnyvale in 1994 and also at IBM, San Mateo, CA in 2003.

- IBM offered to joint venture with Dr. Arunachalam to promote her Web application products with which she was engaged in a pilot trial with France Telecom in 2001.

- IBM offered to buy Dr. Arunachalam's patent portfolio in 2006 for several million dollars.

- IBM copied Dr. Arunachalam's inventions, which are now part of the IBM Eclipse Foundation source code available for download at www. Eclipse.org (eg, **see  Eclipse code version 2.0.1 that include Dr. Arunachalam's inventions**.)

- IBM has been engaged in a similar pattern of racketeering activity and copied the inventions of other inventors, for example, of Leader Technologies, Inc. of Columbus, Ohio and Michael McKibben, who is the inventor of the social networking Facebook Web application, which is now part of the IBM Eclipse Foundation source code available for download at www. Eclipse.org (eg, **see Eclipse code version 2.0.1 that include Mike McKibben's inventions.**)

- **The Executive Branch of the U.S. Government played a very important founding role in the IBM Eclipse Foundation**.

- **SAP played a very important founding role in the IBM Eclipse Foundation**.

- All of the activity of the IBM Eclipse Foundation has gone on in stealth to such an extent that not many know of the Eclipse code.

- SAP, Citizen's  Financial Group, CitiBank, Wells Fargo Bank, JPMorgan and Kronos' (collectively "Delaware Defendants") arguments are irrelevant to the facts of the '506 patent and  contrary to April 5, 2016 Federal Circuit ("CAFC") Ruling (Exh. B)  in Case 14-1562, *Cardpool, Inc. v. Plastic Jungle, Inc*.  that "axed patent claims do not doom amended ones."

- Delaware Defendants and Andrews obstructed justice involving multiple parties thus denying Dr. Arunachalam a due process hearing, without giving a chance to be heard nor being given a fair chance and due process by the Courts, using "counterfeit logic" to manufacture false allegations about Dr. Arunachalam and her patents that masks violation of U.S. laws and misrepresentation by individual lawyers, expert witnesses, judges, PTAB, enterprises and their employees, that has caused great personal and financial injury to Dr. Arunachalam.

**SAP colluded with IBM to hijack and illegally distribute Dr. Arunachalam's invention to multiple IBM Eclipse Foundation members.** Andrews aided, abetted and colluded with them.

IBM provided their internal patent counsel as the USPTO's Commissioner, Dave Kappos (who was one of the IBM Agreement Stewards since 2001 of Eclipse Common Public License Version 0.5, Sec. 7, paragraph 4, that was initially used by SAP and others; "The Agreement Steward reserves the right to publish new versions, including revisions of this Agreement from time to time. No one other than the Agreement Steward has the right to modify this Agreement". IBM is the initial Agreement Steward.") commissioned to kill valuable patents by Dr. Arunachalam who invented Web applications on a Web browser and by Michael McKibben, who invented social networking Web application used by Facebook. This is evident from the fact that even though Michael McKibben won the Markman Hearing in Delaware District Court and won three times at the USPTO in re-examinations, the Commissioner, Dave Kappos, initiated a re-exam against Michael McKibben's patents, unheard of in the history of the USPTO.

- IBM, Andrews and the U.S. Government ensured that Dr. Arunachalam's Web application patents get killed in the Delaware District Court by JPMorgan.

- The IBM Eclipse Foundation installed the Eclipse code at JPMorgan for Web banking applications as a showcase system and awarded JPMorgan as best of breed using Eclipse code that includes Dr. Arunachalam's patented inventions and technology. See **Exhibit J**.

- IBM and SAP held Board membership in the IBM Eclipse Foundation Board and also held strategic roles managing the IP in the IBM Eclipse Foundation. **Exhibit J**

- Six months earlier in 2001 about the same time that the IBM Eclipse Foundation was formed, Judge Sue Robinson of the Delaware District Court and CAFC's Jan Horbaly Clerk of Court and Court Executive, and close associate of the IBM Eclipse Agreement Stewards participated in decisions in the Judicial Conference and re-defined the term "financial interest" away from industry standard set by the IRS and SEC and public accounting standards, to benefit judges to hide stock behind a thin veil of mutual funds and not recuse.

- Facebook's underwriters were JPMorgan, Wells Fargo, Citi Bank, and other Dr. Arunachalam litigants. **Exhibit J**.

- Both, IBM and SAP's key customer is JPMorgan and they ensured that the judges in the Delaware District Court and CAFC and the U.S. Supreme Court did not allow Dr. Arunachalam to be heard, even though JPMorgan did not provide clear and convincing evidence of invalidity of the '500, '158 and '492 patents, contrary to the 35 U.S.C. Section 282 of the Patent Act.

- SAP's external counsel, Jon Strang did a clerkship under CAFC Judge Kimberly Moore and was lead counsel for SAP from Sterne Kessler at the CAFC against the inventor.

Jonathan Strang | Sterne, Kessler, Goldstein & Fox

www.skgf.com/**jonstrang**

Sterne, Kessler, Goldstein & Fox

Mr. **Strang** is an associate in the **Sterne Kessler** Litigation Group specializing in patent ...

Mr. **Strang** re-joined the **firm** after clerking for the Honorable Kimberly Moore at the ...

Before **law** school, Mr. **Strang** served as an officer in the U.S. Navy .

- Dr. Arunachalam's need to attend to her health in medical distress is an "inalienable right," a fundamental and compelling interest, guaranteed by the Bill of Rights. CAFC abridged this right, causing medical injury to Dr. Arunachalam. CAFC dismissed the case without a hearing or an opening appeal brief, when *pro se* Dr. Arunachalam, a senior citizen with disabilities from illness, genuinely trying to meet court rules and deadlines, was in medical distress, to which the CAFC was notified. CAFC's dismissal did not advance a legitimate government interest. Where fundamental rights are infringed, strict scrutiny is the test and the challenged law is generally struck down. *Shapiro v. Thompson*, 394 U.S. 618 (1969); *Shaw v. Hunt*, 517 U.S. 899, 908 (1996); *Vacco v. Quill*, 521 U.S. 793, 799 (1997). CAFC's erratic and disparate treatment of Dr. Arunachalam are the hallmarks of invidious discrimination. *Romer v. Evans*, 517 U.S. 620, 631 (1996). CAFC infringed Dr. Arunachalam's liberty-based substantive due process. In such cases, the U.S. Supreme Court recognizes a non-textual "liberty" which then limits or voids laws limiting that liberty. *Roe v. Wade,* 410 U.S. 113 (1973) (right to choose to have or not have an abortion).

- Eight Justices of the U.S. Supreme Court, CAFC Panel Judges and Delaware District Court Judges have conflicts of interest (financial, relationship or

other) in a litigant, JPMorgan, per their own annual financial disclosure statements and SEC Edgar. They are precluded from ruling in Cases 15-691, 14-1495 and 1:12-cv-282, voiding *ab initio* all judgments. Delaware District Court Judges Robinson and Andrews had conflicts of interest in JPMorgan, when Judge Robinson issued the Markman ruling and judgment in favor of JPMorgan in May 2014. Dr. Arunachalam is guaranteed the protections of 28 U.S.C. §§ 455, 144 and Canons 2 and 3 and FRCP 60(d) and 60(b) which also give the Court the power to grant relief to a party from a judgment, yet she was denied these protections.

- CAFC's medical interference breached multiple laws, depriving Dr. Arunachalam of the protections of the Bill of Rights, fourteenth Amendment, 35 U.S.C. §282 of the Patent Act, Civil Rights Act, American Disabilities Act, FRCP Rule 60(b), 60(d).

- **Chief Justice Roberts set a precedent in recusing himself in *Microsoft Corp. v. i4i Limited Partnership*, 563 U.S. (2011), due to conflicts of interest, Microsoft holdings and his relationships to Microsoft counsel Theodore Olson and Thomas Hungar, Gibson Dunn & Crutcher LLP**

Microsoft is a Third Party Requester in Re-Examinations of Dr. Arunachalam's patents, in particular, the '506 patent. Justice Roberts also has JPMorgan holdings. He did not rely on safe harbor to sit on the *Microsoft* case, even though many of his mutual fund holdings contain Microsoft stock, just like Judge Andrews has admitted that many of his mutual funds hold JPMorgan stock. Judge Andrews admitted he bought direct JPMorgan stock during the pendency of the JPMorgan case 1:12-cv-282.

- **Judges have conflicts of interest in multiple litigants in Dr. Arunachalam's patent cases. Dr. Arunachalam is the inventor of Web applications displayed on a Web browser, like Web banking, social networking, in ubiquitous use**.

Dr. Arunachalam's patented inventions created the millennial generation and transformed the way we live, work and play.

**A.  Delaware District Court Judge Robinson set a precedent and recused in May 2015, immediately upon Dr. Arunachalam's motion to recuse (App. 83a) in Case 1:12-cv-282**

Judge Robinson tainted the JPMorgan case with her conflicts of interest in re-defining "financial interests" contrary to industry accounting standards to suit judges. All rulings in Case No. 1:12-cv-282 are void and must be voided.

**B.  Judge Robinson and CAFC's Jan Horbaly participated in Judicial Conference policy decisions that re-defined "financial interests" to excuse judges from disclosing holdings in litigants behind a profoundly abused "safe harbor *concept*" writing and mutual fund veil, contrary to IRS, SEC and public accounting standards**

The ordinary dictionary definition of "financial interest," and of the IRS, SEC and Business Judgment Rule trump any conflicting or ambiguous definition. Ambiguous definitions in law must be resolved by the superior, controlling definition.

Horbaly resigned soon after failing to docket Dr. Arunachalam s *amicus curiae* entries in *Leader Tech v. Facebook*.

**C.  Judge Robinson's definition of "financial interests" is being used to deny Dr. Arunachalam's motions to recuse across the board related to judge holdings in litigants JPMorgan, Wells Fargo, Citigroup, Bank of America, Microsoft, SAP**

Judges beneficially enjoy profits and losses from these holdings and must pay taxes on those holdings to the IRS. Therefore, they have a very real JPMorgan financial interest, rendering them biased. These Judges have a financial interest, direct stock or mutual funds, in Dr. Arunachalam litigants, presided over Dr. Arunachalam's cases, relying upon Judge Robinson's definition of "financial interests," refusing to recuse.

Petitioner moved that Judge Robinson is the source of all refusals to recuse and must recuse. Judge Robinson recused in May 2015, thereby voiding her orders of May 2014.

**D.    Judge Robinson failed to disclose relationships among CAFC, Skadden Arps, JPMorgan attorneys Dan DeVito and Ed Tulin, JPMorgan, Andrews, Mayer Brown LLP, Judge Stark, that bias her judgment**

Judge Robinson is tainted by Judges Andrews/Stark's financial holdings in JPMorgan. Andrews has relationship conflicts of interest from having worked at Mayer Brown. He presided over the case for over two years before handing it to Judge Robinson on April 9, 2014, one week before the Markman Hearing. She made an erroneous and biased Markman Ruling shortly thereafter, misled by JPMorgan's false evidence. Chief Judge Stark worked at Skadden Arps (JPMorgan's counsel) for many years before becoming a judge. Dan DeVito worked with Reines at Weil Gotschal, the latter's insider relationships at the CAFC triggered Chief Judge Rader's resignation. Weil Gotschal hired CAFC Judge Kimberly Moore as an expert witness in a patent case presided by Judge Robinson, making this conflict unseemly. Ed Tulin clerked before the Judges at the Delaware District Court. The District Court is completely tainted by these relationship conflicts of interest. The collusion caused great harm to Dr. Arunachalam.

**E.    The U.S. Constitution guarantees litigants unbiased judges, a fundamental right**

This case must be heard by Judges who do not have financial holdings and relationships in the litigant(s).

**F.    District Court and CAFC Judges should have been disqualified under 28 U.S.C. §§455, 144, Canon 2, Canon 3(c)**

Andrews has financial and relationship conflicts of interest in JPMorgan, presided over the case between March 12, 2012 and April 9, 2014 and currently presides since May 15, 2015, instead of recusing. This creates the strong appearance of impropriety for which relief through disqualification is warranted, an endemic problem affecting multiple district and appellate courts. Judge Andrews improperly dismissed Dr. Arunachalam's patent cases: *Fulton Bank* (1:14-cv-490-RGA), *Dell* (1:08-cv-00132-RGA), *Fedex (*1:08-cv-00133-RGA) cases, despite conflicts of

interest, triggering Judge Laporte's improper dismissal of Dr. Arunachalam's *Fremont Bank* (1:15-cv-00023-EDL) case in the Northern District of California.

- The entire docket entries in Cases 1.12-cv-282 (D.Del) in the *JPMorgan* case, *Fulton Bank* (1:14-cv-490-RGA), *Dell* (1:08-cv-00132-RGA), *Fedex (*1:08-cv-00133-RGA), *Citizens* (1:12-cv-355) in D. Del, Dr. Arunachalam's *Fremont Bank* (1:15-cv-00023-EDL) case, *SAP*'s 4:13-cv-01248-PJH in the Northern District of California, the appeals and Petitions for Writ of Mandamus in the Third Circuit and Federal Circuit cases 14-1495, 16-110, all of the IPR, CBM Appeals in the CAFC Case Nos. 15-1424, -1429, -1869, 1433, and Fremont Bank case No in the CAFC 15-1831, and the IPR, CBM docket entries at the PTAB on Dr. Arunachalam's Patent Nos. 8,037,158; 5,987, 500; and 8,108,492 are all incorporated by reference herein as if fully re-stated herein.

Judge Andrews' holdings in JPMorgan include stock in: VWENX Vanguard Wellington Admiral with $1,347,496,000 in JPMorgan, the 3rd largest holding in the fund; BVCVX Fidelity Blue Chip Value Fund with $6,961,569,000 in JPMorgan, the 8th largest holding in the fund. A Vice President in BVCVX served as JPMorgan treasurer. Chief Judge Stark has multiple holdings in JPMorgan, detailed in *Leader Tech v. Facebook*, Case 2011-1366 (Fed. Cir. 2011), Renewed Motion for Leave to File Amicus Curiae Brief, July 27, 2012. JPMorgan was underwriter to Facebook. He holds stock in: FUSEX Fidelity Spartan 500 Index Inv with $896,713,000 in JPMorgan, their 10th largest holding; VINIX Vanguard Institutional Index with $ 2,190,882,000 in JPMorgan, their 10th largest holding. Judges' nondisclosure of these interests in JPMorgan does not avoid the appearance of impropriety. *See* 28 U.S.C. §455(c). *Porter v. Singletary*, 49 F.3d 1483, 11th Cir '95. Judge Andrews admitted he acquired direct stock in JPMorgan during the pendency of the case.

Andrews admitted he has JPMorgan holdings, that he worked at Mayer Brown, as per his Senate Confirmation Hearings, that Mayer Brown has longstanding relationships with JPMorgan, Wells Fargo, Citigroup, Bank of America and Fedex. (D.I. 120, p. 8, 1:12-cv-355-RGA). A prior judicial relationship with a major law firm has no statute of limitations with which to conclude that there is not a conflict. Conflicts are conflicts, no matter their age.

CAFC failed to declare mistrial or remand the case because the Delaware District Court and CAFC panel judges should have been disqualified under 28 U.S.C. § 455, Canons 2 and 3, but refused to recuse.

**G.**    **CAFC failed to provide impartial judges, dismissed the Appeal without an opening brief or a hearing, when *pro se* Dr. Arunachalam was in medical distress**

CAFC's medical interference violated Dr. Arunachalam's liberty rights. *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 254-55 (U. S. 1974).

**H.**    **JPMorgan did not provide "clear and convincing evidence" of patent invalidity required by 35 U.S.C. § 282 of the Patent Act, in the Delaware District Court Case**

CAFC's dismissal prevented arguments on the merits and handed Dr. Arunachalam's valuable property to JPMorgan without justification.

JPMorgan willfully misled the court, with false arguments, out of context, defrauding the fact-finding process.

**I.**    **Mutual fund "safe harbor *concept*" developed by Judge Robinson is <u>not</u> a law, rule, advisory or even a guideline. Plain language of the Code of Conduct for Judges prevails over subsequent judicial interpretations**

U.S. law prohibits inferior guidelines, rulings and opinions, especially ambiguous ones like the "safe harbor concept," from superseding well settled law and precedent.

"[J]udicial interpretations of a statute by reenactment cannot overcome the plain meaning of a statute. '…does not constitute an adoption of a previous administrative construction.'" *Demarest v. Manspeaker*, 498 U.S. 184, 603 (1991).

The U.S. Supreme court clearly stated that an advisory opinion, like the safe harbor concept, is "entitled only to some deference." *Christensen v. Harris County*, 529 US 576 (2000) at 587. The safe harbor concept was not "arrived at after… formal adjudication or notice-and-comment rulemaking… Interpretations such as those in opinion letters… agency manuals… lack the force of law— do not warrant Chevron-style deference." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc*., 467 U. S. 837 (1984). The Guide to Judicial Policy, Vol. 2B, Ch. 2 does not contain the force of law, as does the Code of Conduct for U.S. Judges, Canon 2.

**J.      Composition of Mutual Fund is Critical**

A mutual fund makes no money apart from the profits and losses of its underlying holdings. The statute requires disclosure of "every source of income." The *sources of income* in a mutual fund —the portfolio stocks and bonds—are the components of a mutual fund that should be disclosed, not merely the fund's name, to assess conflicts of interest. If mere disclosure of the *name* of the mutual fund were sufficient, then this judiciary policy would not be needed.

**K.      "Safe Harbor" is an ambiguous concept in the Advisory**

Even the safe harbor caveat states "it is important for a judge to determine whether a particular proposed investment is a 'mutual or common fund' and, therefore, qualifies under the safe harbor provision of Canon 3C. This advisory statement is ambiguous since Canon 3C nowhere uses the term "safe harbor." Whether or not the judge complies with this ambiguous provision is itself ambiguous. The court cannot reject as frivolous Dr. Arunachalam's concern for impartiality

since even the judge cannot ascertain whether he or she is compliant with an ambiguous "safe harbor concept."

**L.      "Participates in the management of the fund" is ambiguous**

Canon 3 (3)(c)(i) is ambiguous, since "financial interest" is not ambiguous anywhere else in law, except when applied to judges. In such situations in law, especially since the judge pays taxes on those holdings, it does not exempt judges from a normal and routine definition of "financial interest." To acknowledge that one must pay taxes on financial investments held in litigants, and still be permitted to preside over cases where decisions favorable to a litigant will benefit one's investments, stands the whole notion of judicial impartiality on its head.

To be aware of the portfolio holdings, and to leave one's money in that fund vs. another and  reviewing the funds quarterly or semi-annual results, is to manage one's fund holding.

The Court must differentiate why holding mutual funds invested in JPMorgan securities would not be considered a "material fact."

**II.      PTAB Judges McNamara and Stephen Siu have conflicts of interest in Microsoft, JPMorgan, SAP and other Litigants in Dr. Arunachalam's Patent Re-examinations, voiding their rulings**

**Judge McNamara refused to recuse despite his direct stock holding in Microsoft** and other conflicts of interest, denying electronic filing. Judge Siu's Microsoft and IBM conflicts preclude him from ruling on Microsoft's Re-exam against Dr. Arunachalam, voiding his ruling.

**III.      SEC/EDGAR Summary of Justices and Judges' Financial Holdings**

SEC/Edgar summarize the materiality of JPMorgan holdings by Chief Justice Roberts, seven Justices, CAFC Panel Judges, Judges Andrews, Stark's mutual funds, for example:

**Chief Justice Roberts holds Fidelity Contrafund:**

How to look up a mutual fund portfolio at www.sec.gov:

Determine Ticker Symbol, e.g., Fidelity Contrafund: FCNTX.

Go to http://www.sec.gov/

Select "FILINGS | Company Filings Search" on drop down menu

Type "FCNTX" in  Fast Search box ("Ticker or CIK")

Select "Documents" button for most recent "N-CSR"

Select  "htm" file for the full report, "Type" column, "N-CSR"

URL for Fidelity Contrafund, FCNTX, N-CSR, Feb. 26, 2015, U.S. SEC:

http://www.sec.gov/Archives/edgar/data/24238/000070420715000083/conmain.htm
Click Ctrl F.
Type "JPMorgan" – there are 24 instances.

**Fidelity Contra Fund- FCNTX, FCNKX** is a sector fund in financial services with heavy emphasis on Dr. Arunachalam's litigants. The  holdings are summarized at the SEC: at least $785.4M invested in JPMorgan; $20.4B in Banks and Financial Services; Microsoft $2.1B; M&T Bank, Visa, $2B; BofA $1.02B; Wells Fargo Bank $3.9B; Citigroup $696.2M; Fiserv $225.9M; Google $6.2B, Facebook $3.6B, Apple $3.7B, Berkshire Hathaway $5.5B, IT $28.6B; e-retailer litigants $25.3B; subtotaling to at least $104B in conflicts of interest of the Justices, CAFC panel Judges and Judges Andrews and Stark in this fund.

The Justices' own disclosure statements and SEC/Edgar evidence at least the appearance of impropriety, if not outright impropriety. They have JPMorgan and other litigant holdings in at least the following: Justice Breyer in Vanguard 500 Index Fund, direct stock in IBM, Lowes; Justices Alito and Kagan in Vanguard Total Stock Market Index Fund;  Justice Alito in ishares S&P 500 Growth Fund, IVW; Justice Scalia in Vanguard, Wells Fargo Bank, PIMCO, Blackrock, Fidelity, Templeton, Schwab mutual funds; Justice Clarence Thomas in Capital Growth and Income Funds, CWGIX; (JPMorgan is the custodian of assets in his AEPGX and RERGX funds); Justice Sotomayor in Templeton Global Bond A Fund, TPINX; Nuveen NWQ Large Cap Value

A fund, NQCAX, (which has stock in JPMorgan $21.5B; Citigroup $28.5B; Wells Fargo Bank $19.7B); Columbia TRI LC Growth A Fund LEGAX; Blackrock GLB allocation FD class A fund, MDLOX.; Justice Ginsburg has multiple JPMorgan mutual funds, JPM Tax Aware Equity Fund, etc. Some Justices also have direct stock in litigants.

CAFC panel and/or Delaware District Court judges have:

**MFS Value Fund – MEIAX** has $1.56B in JPMorgan investments and-$1.12B in Wells Fargo.

**Eaton Vance Large Cap Value EHSTX** has $135.2M in JP Morgan investments, $121.2M in BofA, $69.4M in Wells Fargo, $118.7M in CitiGroup. **American Growth Fund, AGTHX** has $612.1M invested in JPMorgan; $12B in Banks and Financial Services; Microsoft $1.9B; Wells Fargo Bank $641M; Citigroup $2.64B; Google, Facebook, Apple, Berkshire Hathaway, IT services $38.4B; e-retailer litigants $32B; with $90.6B in conflicts of interest of the Judges in this fund.

The judges know of these JPMorgan holdings in these funds from which they receive reports at least twice a year pursuant to SEC rules.[1]

---

[1] *See* SEC Final Rule: Shareholder Reports and Quarterly Portfolio Disclosure of Registered Management Investment Companies, Securities and Exchange Commission, 17 CFR Parts 210, 239, 249, 270, and 274, [Release Nos. 33-8393; 34-49333; IC-26372; File No. S7-51-02], RIN 3235-AG64 http://www.sec.gov/rules/final/33-8393.htm#IB

**Exhibit D1:** A subset of those Documented Retaliations which also qualify as one or more of

the RICO Predicate Acts that are itemized at 18 U. S. C. §§ 1961(1)(B), (1)(D), and (5).

**Same items as contained in Exhibits A2, C1, D2 and D3.**

**Exhibit D2:**

These documents are true and accurate copies of files downloaded from www.eclipse.org on April 18, 2016

1.  2002-08-29 Common Public License (CPL) Version 0.5
    http://www.eclipse.org/legal/cpl-v05.html
2.  2004-09-02 Tentative IP Log for eclipse.platform, eclipse.jdt and eclipse.pde
    http://www.eclipse.org/projects/ip_log.php?projectid=eclipse.platform,eclipse.jdt,eclipse.pde

3.  2004-09-02 Eclipse CPL to EPL Transition Plan http://www.eclipse.org/legal/cpl2epl/

**Exhibit D3: A partial list of RICO Predicate Acts by Defendant Andrews and a partial list of Documented Retaliations which Plaintiff had suffered *prior* to the date on which this federal case was first filed (April 18, 2016.)**

**A. Judge Andrews' rulings and Orders in the cases involving Dr. Arunachalam's patents have been contradictory to his own rulings: as in *Blackbird Tech LLC v. Service Lighting and Electrical, et al.*, C.A. No. 15-53-RGA, Memo. Or. at 1-2 (D. Del. Dec. 1, 2015):**

> "Adequate written description is a question of fact. Patent claims are presumed to be valid. In order to invalidate a patent claim on the basis of inadequate written description, I would have to find, by clear and convincing evidence, that the patent specification does not describe the claimed invention sufficiently to reasonably convey to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date. Typically, to make such a finding requires claim construction and expert testimony about what those skilled in the art would understand from the specification…" (emphasis added)

Judge Andrews not only denied due process to Dr. Arunachalam in the Fulton bank case, but he willfully failed to give credence to the fact that 35 U.S.C § 282 of the Patent Act allows the presumption of validity of Dr. Arunachalam's '339 patent. Defendant JPMorgan did not provide clear and convincing evidence of invalidity of Dr. Arunachalam's patents, U.S. patent No. 5,987,500 ('500 patent), 8,037,158 ('158 patent) and 8,108,492 ('492 patent) in Case 1:12-cv-282 (D. Del) with completely different claims and specifications, different from the specification and claims of the '339 patent. Fulton Bank, who is a customer of IBM and participates in the IBM Eclipse Foundation and is a user of the Eclipse code, did not provide clear and convincing evidence of invalidity of the '339 patent. Yet, without being a trier of facts and without investigating any facts relevant to the '339 patent, Judge Andrews dismissed the Fulton Bank case, based on hearsay, when the attorney who has been sued for malpractice for his egregious and unethical conduct, falsely stated, in a self-serving manner, that the '339 patent is collaterally estopped by the three patents-in-suit in the JPMorgan case. This triggered Judge LaPorte in the Northern District of California to dismiss the Fremont Bank case in California based on Judge Andrews' egregious Order of dismissal of the Fulton Bank case, as if the '339 patent were collaterally estopped by the

patents-in-suit in the JPMorgan case, which it is not, without investigating the facts specific to the

'339 claims.

**B. Judge Andrews' ruling in the Fulton Bank case on Dr. Arunachalam's '339 patent, which is a completely different patent from the patents-in-suit in the JPMorgan case, is contrary to April 5, 2016 Federal Circuit ("CAFC") Ruling (Exh. B) in Case 14-1562, *Cardpool, Inc. v. Plastic Jungle, Inc.* that "axed patent claims do not doom amended ones" and evidence total abuse of power, abuse of discretion, bias and invidious discrimination against and harassment of Dr. Arunachalam**

CAFC held that the validity of the new claims was not examined by any Court and that the district

court's prior invalidity decision on *Cardpool Inc.*'s patent 7,494,048 was based on the prior set of

claims and had **no effect on the new claims** granted upon reexamination:

> "district court's final judgment as to an original group of claims does not automatically render that judgment *res judicata* as to new claims granted upon reexamination."

> "...*Fresenius USA, Inc. v. Baxter Int'l, Inc.,* 721 F.3d 1330, 1346 (Fed. Cir. 2013)… CAFC held…"the statute requires that a final PTO decision affirmed by this court be given effect in pending infringement cases that are not yet final, and is not affected by a subsequent final court ruling contrary to the PTO ruling. *Cardpool* Dist. Dk. 93 at 1–2 (May 29, 2014)."… PTO's issuance of the Reexamination Certificate was an interpretation or application of federal law, and must be given retroactive effect because the infringement suit was still pending on appeal. Cardpool argues that the district court erred in law, because "the controlling interpretation of federal law must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." *Id.* (quoting *Harper v. Va. Dep't of Taxation,* 509 U.S. 86, 97 (1993)). CAFC "requires that this principle "applies with equal force where the change is made by an administrative agency acting pursuant to legislative authorization." *Thorpe v. Hous. Auth.,* 393 U.S. 268, 282 (1969)." "*Cardpool also criticizes the district court for "fail[ing] to consider the case under the reexamined claims*." Cardpool Br. 21. Cardpool states that the district court "committed legal error in not giving full effect to the reexamined amended claims…and by denying the motion to vacate without reconsideration of the basis in view of the amended reexamined claims." *Id.* at 22." "Cardpool…stated that "<u>if the Court is inclined to apply its prior invalidity decision to the amended reexamined claims…, such a determination must not be</u> done in a cursory manner but with a full opportunity of the parties to provide briefing and argument." *Cardpool* Dist. Dk. 93 at 5–6 (May 29, 2014)."

The validity and infringement of the claims in the '339 patent have not been evaluated by any

court. The Delaware district court's initial unpatentability ruling in another case involving a

completely different set of patents and different claims do not apply on the facts involving the '339 patent with new claims, because the claims that were the subject of the prior ruling on a different set of patents were different and do not exist "in the same form."

This Court must grant Dr. Arunachalam her due process right to demonstrate that new claims of the '339 patent differ substantially from the claims rejected, albeit fraudulently, by the Court in another case involving ***different patents***. The district court's decision was not final nor was it affirmed on appeal before the PTO's reexamination decision. The District Court's decision was not affirmed by the CAFC, which dismissed the case ***without adjudicating on the merits of the case***. The district court's original decision is limited to the claims and grounds that existed in that case related to the '500, '492 and '158 patents-in-suit, not on the '339 patent. CAFC cites *"Allard v. DeLorean*, 884 F.2d464, 466 (9th Cir. 1989)."

C.  **Courts must examine changed factual circumstances. Judge Andrews failed to do so with regard to the '339 Patent. Judge Andrews Invoked Neither Equity nor the Law**:
On 4/5/16, CAFC stated in 14-1562:

"Dismissal "with prejudice" operates as *res judicata* as to the same cause of action. 747 Am. Jur. 2d Judgments § 547. How this rule of finality would apply to changed circumstances depends on the factual circumstances of the specific situation. *See Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327–328 (1955) ("That both suits involved 'essentially the same course of wrongful conduct' is not decisive" of the applicability of the doctrine of *res judicata* and courts must examine factual circumstances, such as, for example, whether "new causes of action" or "substantial changes in scope" of wrongful conduct exist, in determining its applicability.) *Res judicata* does not automatically arise against unknown future situations. In *Aspex*, the court applied these principles to the facts of that case, recognizing…If the claim did not exist at the time of the earlier action, it could not have been asserted in that action and is not barred by res judicata." 672 F.3d at 1342; *see also Lawlor*, 349 U.S. at 328 (a prior judgment "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case"). On the facts and procedures of this case, the issue of validity of the reexamined claims remains to be addressed in any future proceeding. In the initial proceeding, the original claims were adjudicated only on grounds of subject matter eligibility under section 101. As in *Aspex*, the effect of a prior judgment rendered on specific issues as applied to the original claims, depends on the facts and issues of the reexamination, and invokes equity as well as law. 672 F.3d at 1341–1346."

**D. Judge Andrews neither examined the facts nor did he exercise the application of the law to the facts. His ruling in the Fulton Bank case on the '339 patent was illogical, implausible, and is without support in inferences that may be drawn from the facts in the record.**

"…a district court's denial of a Rule 60(b) motion is reviewed for abuse of discretion. *United States v. Asarco Inc.*, 430 F.3d 972, 978 (9th Cir. 2005). In reviewing discretionary rulings, the Ninth Circuit determines whether the district court applied an incorrect legal rule or whether the <u>district court's application of the law to the facts</u> was "<u>illogical, implausible, or without support in inferences—that may be drawn from the facts in the record.</u>" *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (*en banc*)…(quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 577 (1985)).

**E. Judge Andrews' Ruling in the Fulton Bank case on the '339 Patent is contrary to U.S. Supreme Court Rulings and <u>must be vacated</u>.**

"<u>The Supreme Court counsels that "vacatur must be decreed for those judgments whose review is . . . 'prevented through happenstance'—that is to say, where a controversy presented for review has 'become moot due to circumstances unattributable to any of the parties.'</u>" *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 23 (1994) (quoting *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950). …<u>remand so the district court can decide whether to vacate its judgment in light of 'the consequences and attendant hardships of dismissal or refusal to dismiss' and 'the competing values of finality of judgment and right to relitigation of unreviewed disputes.'</u>" *Dilley v. Gunn*, 64 F.3d 1365, 1370–71 (9th Cir. 1995) (quoting *Ringsby Truck Lines, Inc. v. W. Conference of Teamsters*, 686 F.2d 720, 722 (9th Cir. 1982), and stating that "*Ringsby* is wholly consistent with the 'equitable tradition of vacatur' reflected in *U.S. Bancorp*.")." (Emphasis added)

**F. The '339 patent is a completely different patent with a completely different specification and totally different claims from the patents-in-suit previously asserted. A claim term cannot be construed stripped from the context of the total claim.**

The claim term in the '339 patent, "value-added service network," is definite because the boundaries of the patent protection sought are clear. Older cases should be applied with care, according to the facts of each case. Prosecution history estoppel and disclaimer prevent the Court from ruling several terms indefinite, such as "value-added service network," "service network," "value-added network switch." <u>The District Courts'</u> (in Judge Robinson's court and Judge Andrews' court) <u>and CAFC's errors were prejudicial and willful, evidencing collusion between the Court, Andrews, Judge Robinson, CAFC Judges  with JPMorgan, Fulton Bank, IBM and the</u>

IBM Eclipse Foundation . The Court must analyze claim terms in view of the specification from the perspective of those skilled in the relevant art since <u>a particular term used in one patent or application may not have the same meaning when used in a different application</u>. Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1318, 74 USPQ2d 1184, 1188 (Fed. Cir. 2005). **"Value-added service network" is a term coined by the inventor, Dr. Arunachalam and can only take on that meaning ascribed to it by the inventor**. The PTAB interpreted this claim term. Definiteness of claim language must be analyzed*, not in a vacuum***, but in light of the content of the particular application disclosure; the teachings of the prior art; and the claim interpretation that would be given by one possessing the ordinary level of skill in the pertinent art at the time the invention was made**. In reviewing a claim for compliance with 35 U.S.C. 112(b), **the Court must consider the claim as a whole** to determine whether the claim apprises one of ordinary skill in the art of its scope and, therefore, serves the notice function required by 35 U.S.C. 112(b), by providing clear warning to others as to what constitutes infringement of the patent. See *Solomon v. Kimberly-Clark Corp*., 216 F.3d 1372, 1379, 55 USPQ2d 1279, 1283 (Fed. Cir. 2000); In re Larsen, No. 01-1092 (Fed. Cir. May 9, 2001) (unpublished) (The preamble of the Larsen claim recited only a hanger and a loop but the body of the claim positively recited a linear member. <u>The court observed that the totality of all the limitations of the claim and their interaction with each other must be considered to ascertain the inventor's contribution to the art</u>. Upon review of the claim in its entirety, the court concluded that the claim at issue apprises one of ordinary skill in the art of its scope and, therefore, serves the notice function required by 35 U.S.C. 112.) Examples of claim language which have been held to be indefinite set forth in MPEP § 2173.05(d) are **fact specific** and should not be applied as per se rules. CAFC provides guidance (emphasis added):

> "The Federal Circuit's decision in *Powell v. Home Depot,* App. No. 2010-1309 (Fed. Cir. Nov 14, 2011)… reminds one "**the prior art cited in the prosecution history of a**

<u>**patent forms part of the intrinsic evidence for claim construction purposes**</u>," *Kumar v. Ovonic Battery Co.,* 351 F.3d 1364, 1368 (Fed. Cir. 2003) (citing *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.,* 279 F.3d 1357, 1371-72 n.4 (Fed. Cir. 2002); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996))."

"In a six-four *en banc* decision in *Lighting Ballast Control LLC v. Philips Electronics North Am. Corp.*, the Federal Circuit confirmed its practice of *de novo* claim construction review. Judge Newman stated:"Implementing the Supreme Court's decision in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) (*Markman II*), aff'g *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*) (*Markman I*), this court in *Cybor* held that patent claim construction receives *de novo* determination on appeal, that is, review for correctness as a matter of law. Such <u>review is conducted on the administrative record and any additional information in the record of the district court, and is determined without deference to the ruling of the district court</u>." "Given the Supreme Court guidance in *Markman II* that claim construction is "better suited to determination by a judge rather than a jury," Judge Newman saw three options for the appropriate standard of review:

"The first, urged by Lighting Ballast, holds that "<u>patent claim construction is most reasonably classified as a question of fact</u>" and so should be reviewed only for clear error. The second, supported by the Solicitor General for the United States, holds that claim construction should be subject to a "hybrid of *de novo* review and deferential review," with "<u>the factual aspects of claim construction to be reviewed on the clearly erroneous standard, while the final conclusion receives review as a matter of law</u>." The third is that *Cybor* is a "reasonable and correct" interpretation of *Markman II*, such that the practice of *de novo* claim construction review should be maintained."

"**Judge Lourie's Concurrence**…"It would hardly promote uniformity … for us <u>to bless a claim construction in one district court, based on that court's judging the credibility and demeanor of the expert witnesses in one case, when a different case might lead to a different result based on a different district judge's appraisal of different witnesses</u>.

<u>[C]laim construction is not a process that normally involves historical facts. It primarily involves reading the patent's written description as well as the prosecution history of the patent</u>, and this court is quite as able to do that as any district court, sometimes better."

<u>Judge O'Malley cites several law review articles for the proposition</u> that "[p]arties do not make claim drafting decisions based on the standard of review we apply to trial court claim constructions. Nor could they, given the panel-dependent nature of our own determinations."

"<u>Claim construction disputes are very fact specific—patents do not follow a formulaic structure, or even contain oft repeated language. Claims are drafted, redrafted, and amended in ways intended to reflect and capture particular inventions in a particular field, **to avoid very specific prior art**, and to respond to the rejections of the unique</u>

patent examiner involved in the application process. It is rare that any two claims we review contain the same phrasing and **even more rare that the context in which the phrasing is used would not alter the meaning of even almost identical words**…. Combining the uniqueness of each claim term to be reviewed with the variations in rationale employed by the divergent members of this court, provides little practical guidance regarding how any claim construction dispute might be resolved in this forum—and certainly not the uniform reliability of outcome with which the majority now credits our jurisprudence in this area…we know how to delve into the "very fact specific" record, to trace the prosecution history of a claim that was "drafted, redrafted, and amended," to understand the "particular inventions" and the distinguishing features from the "very specific prior art." It doesn't matter that the claim construction in one case is not likely to apply to a different case involving a different patent. What matters is that the body of case law under *Cybor* has given us a framework within which to apply the principles of claim construction in a predictable manner."

In Dr. Arunachalam's parent 6,212,556 ('556) patent prosecution history (**Exh. G**), the inventor, Dr. Arunachalam distinguished her invention over the cited art, U.S. Patent No. 5,828,666 ("Focsaneanu"). **Judge Andrews willfully colluded with JPMorgan, Wells Fargo Bank, Citi Bank and SAP in their willful omissions** that prosecution history estoppel already has established that the term "value-added network switch" is not indefinite and relates to application layer network switches, not with a network layer switch; and that prior art is not only cited, but also discussed in detail in the specification of the '506 patent. The claim language, disclosure in the written description, and the meaning to persons of ordinary skill are fact specific. Both Judge Robinson and Judge Andrews engaged in racketeering with JPMorgan, IBM, the IBM Eclipse Foundation, in their willful actions and omissions with regard to the claim terms "value-added network switch" and "service network." They did not construe these terms in view of the prosecution history's treatment of the prior art and because prior art sheds light on the meaning of a term as cited by the patentee. CAFC states:

"cited art as intrinsic evidence for purposes of claim construction….**claims should be construed in view of the prosecution history's treatment of the prior art** so as to determine what the applicant gave up in obtaining allowance of the claims...**When prior art that sheds light on the meaning of a term is cited by the patentee**, it can have particular value as a guide to proper construction of the term, because it may indicate

not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." *Arthur A. Collins, Inc. v. Northern Telecom Ltd,* 216 F 3d. 1042 (Fed. Cir. 2000)."

Judge Andrews' willful abuse of discretion and ruling without investigating the facts and dismissing a case based on collateral estoppel that did not apply to the '339 patent is collusion with Fulton Bank, a customer of IBM, and with JPMorgan. Defendant Judge Andrews' willful acts and omissions have injured Plaintiff financially and also her health.

**G. This pattern of racketeering by Judge Andrews and Judge Robinson with IBM has gone on several times during the course of the last ten years. Judge Andrews willfully dismissed the *Dell* and *Fedex* cases, without being a trier of facts.**

Dell and Fedex are both customers of IBM and Microsoft, who are members of the IBM Eclipse Foundation. This was particularly egregious because Judge Andrews held direct stock in Fedex when he dismissed Dr. Arunachalam's case against Fedex and Dell, as seen from his own annual financial disclosure statements and his Testimony at his Senate Confirmation Hearing. This Court must take judicial notice of all his Orders and Memorandum of Opinion in the JPMorgan case 1:12-cv-282, Citizens' Financial Group case 1:12-cv-355, the Fulton Bank case, the Dell and Fedex cases and in Plaintiff's case 1:15-cv-259 against Pazuniak et al, incorporated by reference herein, his financial disclosure statements, his Senate Confirmation Hearing, SEC reports and the fact that he worked at Mayer Brown by which Judge Andrews was conflicted from presiding over those cases.

**H. Andrews' actions and omissions have been egregious and erratic and evidence collusion with IBM, JPMorgan, Wells Fargo, Citibank and Fulton Bank, who are all IBM customers and members of the IBM Eclipse Foundation**

1. **Andrews' Own Admissions of Owning Direct Stock in JPMorgan:**

   Andrews admitted he bought direct stock in JPMorgan during the pendency of the case, in addition to him admitting he had other financial holdings in the litigants via mutual funds.

2. **Andrews' Refusal to Recuse Multiple Times Despite Appearance of Bias:**

Andrews refused to recuse numerous times on multiple Plaintiff's cases and continues to preside over these cases, where he is biased in favor of the litigants, such as JPMorgan, CitiBank, Wells Fargo and SAP, as well as in Plaintiff's malpractice case against Pazuniak et al.

3. **Andrews dismissed Dr. Arunachalam's 60(b), 60(d) motions for fraud on the court** in the JPMorgan case and in the Citizens Financial Group, Wells Fargo, CitiBank, Kronos cases **for no valid reason, but for a self-serving reason of obstruction of justice of his own wrongdoings**.

I. **Andrews manipulated the Court Hearing transcripts of the Hearing held in Delaware in September 2014 in the Citizens' Financial Group, Wells Fargo, CitiBank, Kronos cases.**

Dr. Arunachalam clearly stated in the Court that she was delivering the 60 (b), 60(d)(3) motion at the Court, which set the tone of the Court that day at the Hearing and after which the Court went into pin drop silence. The Court transcripts have <u>removed the statement made by Dr. Arunachalam that the Motion</u> papers being delivered in the Court Hearing  and which Andrews asked Dr. Arunachalam to serve on the Defendants while the Court Hearing  was in session, <u>involved a 60(b) 60(d)(3) Motion for fraud on the court</u>.

J. **Andrews' erratic and disparate treatment of Dr. Arunachalam are the hallmarks of invidious discrimination.**

<u>Andrews infringed Dr. Arunachalam's liberty-based substantive due process and has violated the laws of the United States</u>. In such cases, the U.S. Supreme Court recognizes a non-textual "liberty" which then limits or voids laws limiting that liberty. Also, <u>Andrews' untimely and erratic admission almost 3 years after the case has been going on of buying direct stock in JPMorgan was shocking</u>.

Dr. Arunachalam's need to attend to her health to avert a medical emergency is an "inalienable right," a fundamental and compelling interest, guaranteed by the Bill of Rights. Andrews abridged this right, causing medical and other injury to Dr. Arunachalam. Andrews threatened to hurt Dr. Arunachalam's case against Pazuniak, when *pro se* Dr. Arunachalam, a senior citizen with disabilities from illness, genuinely trying to meet court rules and deadlines, informed the Court that she has a need for a medical leave of absence with three letters, two from her Doctors and one from her church friend who is a Stanford doctor. Andrews' threats and egregious actions toward Dr. Arunachalam did not advance a legitimate government interest. Where fundamental rights are infringed, strict scrutiny is the test and the challenged law is generally struck down. *Shapiro v. Thompson*, 394 U.S. 618 (1969); *Shaw v. Hunt*, 517 U.S. 899, 908 (1996); *Vacco v. Quill*, 521 U.S. 793, 799 (1997). Andrews' erratic and disparate treatment of Dr. Arunachalam are the hallmarks of invidious discrimination. *Romer v. Evans*, 517 U.S. 620, 631 (1996). Andrews infringed Dr. Arunachalam's liberty-based substantive due process. In such cases, the U.S. Supreme Court recognizes a non-textual "liberty" which then limits or voids laws limiting that liberty. *Roe v. Wade,* 410 U.S. 113 (1973) (right to choose to have or not have an abortion). <u>Andrews' medical interference and harassment of Dr. Arunachalam when she notified him of a medical need breached multiple laws, depriving Dr. Arunachalam of the protections of the Bill of Rights, fourteenth Amendment, 35 U.S.C. §282 of the Patent Act, Civil Rights Act, American Disabilities Act, FRCP Rule 60(b), 60(d)</u>.

Eight Justices of the U.S. Supreme Court, CAFC Panel Judges and Delaware District Court Judges have conflicts of interest (financial, relationship or other) in a litigant, JPMorgan, per their own annual financial disclosure statements and SEC Edgar.

They are precluded from ruling in Cases 15-691, 14-1495 and 1:12-cv-282, voiding *ab initio* all judgments. Delaware District Court Judges Robinson and Andrews had financial, relationship and/or other conflicts of interest in JPMorgan, when Judge Robinson issued the Markman ruling and judgment in favor of JPMorgan in May 2014. Dr. Arunachalam is guaranteed the protections of 28 U.S.C. §§ 455, 144 and Canons 2 and 3 and  FRCP 60(d) and 60(b) which also give the Court the power to grant relief to a party from a judgment, yet she was denied these protections by Andrews.

**K.  Andrews Bullied and Harassed Dr. Arunachalam, Refused to grant her extension of time to file amended complaint against Pazuniak et al for medical reasons and grant her unrestricted medical leave of absence, as the other courts have.**

When all the other Courts in the Federal Circuit in the SAP and Fremont Bank case appeals and the USPTO re-examination case appeals granted Dr. Arunachalam her medical leave of absence and enlarged the time to file her briefs, Andrews has been biased in favor of Pazuniak and refused to give Dr. Arunachalam her much needed extension of time for medical leave of absence. Instead, he let Defendants Pazuniak et al lie to the Court about Plaintiff Dr. Arunachalam's physician, a very dedicated Board-certified Endocrinologist affiliated with Stanford Hospital, Sequoia Hospital and the VA Hospital, and did not sanction them for lying. Instead Judge Andrews bullied Dr. Arunachalam and had her write several briefs and he has still not given her the unrestricted leave of absence she so desperately needs without requiring her to file her amended complaint by May 18, 2016.

**L.  Andrews' refusal  five times to let Dr. Arunachalam, the real party-in-interest substitute in as Plaintiff in the JPMorgan case shows collusion, racketeering with JPMorgan and IBM and the IBM Eclipse Foundation**

In all the other Courts, every single Judge has recognized that Dr. Arunachalam is the inventor and assignee of her patents and is the real party-in-interest and allowed her to be substituted in as Plaintiff. Andrews refused to recognize Dr. Arunachalam as sole owner and real party-in-interest in the JPMorgan case. Dr. Arunachalam filed at least 5 motions asking him to allow her to be substituted in as Plaintiff, but he has not allowed this to date in the JPMorgan case. Andrews has self-servingly and willfully done this because he is afraid that other evidences of his atrocities and racketeering would be exposed. He has only evidenced that he wishes Dr. Arunachalam gone as quickly as possible.

M. **Andrews willfully committed obstruction of justice when he willfully dismissed the legitimate malpractice causes of action against Pazuniak et al filed by Dr. Arunachalam, the real party-in-interest. In his Order, he stated that only her company Pi-Net can file this and not Dr. Arunachalam, even though she is the real party-in-interest.**

This is because he does not want to go over claim construction issues arising from the JPMorgan case and George Pazuniak committing malpractice by putting forth wrong claim constructions against Dr. Arunachalam's express advice not to do so. **This is only further evidence of racketeering in collusion with JPMorgan, IBM and the IBM Eclipse Foundation**. He failed to address the fact that Judge Robinson's claim construction ruling is in legal error and not based on law nor the facts of the case, in which JPMorgan willfully committed obstruction of justice to not let Judge Robinson see the facts of the case. JPMorgan did not provide "clear and convincing evidence" as required by Sec. 282 of the Patent Act that any of the claim terms were indefinite. Key claim terms have been defined with great clarity both in the specification and in the prosecution history in view of the prior art cited. For example, "value-added network switch." Prosecution history estoppel prevents Andrews or Judge Robinson or JPMorgan or Pazuniak et al from stating that "value-added network switch" is indefinite or that a "value-added network

switch" is a "web page…," as Pazuniak advanced to the USPTO, committing malpractice against Dr. Arunachalam's instructions based on sound technical and legal grounds.

Andrews willfully overlooked the atrocities of Pazuniak and dismissed the legitimate malpractice causes of action filed by Dr. Arunachalam, without trying the facts of the case. Andrews willfully colluded with JPMorgan in wanting to make the JPMorgan case and any other cases where it involves claim construction, and Dr. Arunachalam to go away. Andrews is willfully engaged in racketeering with JPMorgan and all the Defendants who are involved in the IBM Eclipse Foundation and the USPTO judges, Brian McNamara and Stephen Siu (a former IBM employee and former Microsoft employee), both of whom own direct stock in Microsoft and are conflicted to preside over Dr. Arunachalam's Microsoft and SAP re-examination cases, thereby voiding all rulings by these Judges in the USPTO and PTAB.

## N. Andrews' Collusion with Judge Robinson and Racketeering with IBM and IBM Eclipse Foundation

Judge Robinson along with CAFC's Jan Horbaly, changed the definition of "financial interest" in 2001, contrary to IRS and public accounting standard definitions of the term, at the same time as the Executive Branch of the Government participated in the founding of the IBM Eclipse Foundation.

On Nov. 29, 2001, IBM "donated" $40 million to The Eclipse Consortium (later renamed The Eclipse Foundation) to promote "open source" software (free to users without licenses). *See* 2001 IBM Annual Report Armonk NY, p. 21 ("We donated more than $40 million in application development tools to a new, independent, open-source software community called Eclipse."); *See* also Eclipse.org (Nov. 29, 2001). Minutes of the eclipse.org Board Meeting, Nov. 29th, 2001.

On August 29, 2002, Eclipse issued version 2.0.1 of its source code (the secret sauce of a computer program). That version included all of the innovations of Dr. Arunachalam and of other inventors such as, for example, Columbus, Ohio innovator, Leader Technologies, Inc.

Eleven weeks earlier, it has been reported that Leader had given a custody copy of its invention to their patent attorney, who was also IBM's chief **_outside_** intellectual property counsel. At that time, David J. Kappos was IBM's chief **_inside_** intellectual property counsel, who later went to head the USPTO.

The Aug. 28, 2002 Eclipse Version 2.0.1 carried false IBM copyright claims over Dr. Arunachalam's innovations and innovations of other inventors like Leader's innovations and references to an (Eclipse) Common Public License (CPL) version 0.5.

By 2008, Eclipse Foundation had 191 members: a veritable *Who's Who* of technology companies, their banks and mutual funds, and their federal government cronies, including IBM, Google, Alphabet (Google), YouTube (Google), SAP, Oracle, Sybase, Rational, HP, Wind River, Intel, Motorola, Hitachi, Samsung, Nokia, In-Q-Tel (C.I.A.), National Security Agency (NSA), National Venture Capital Association (NVCA), Fidelity, T. Rowe Price, Vanguard, Morgan Stanley, EMC, Dell, Facebook, Instagram (Facebook), LinkedIn (Facebook), WhatsApp (Facebook), Square (Facebook), Squarespace (Facebook), PayPal, Goldman Sachs, Togethersoft, Borland, QNX, Qualcomm, Xerox, Micron Technology, Cisco, Netflix, Apple, AOL, Kleiner Perkins, Yahoo, Tumblr (Yahoo), Flickr (Yahoo), Twitter, Computer Associates (CA), Microsoft (via University of Washington), Nokia (Microsoft), Siemens, IDG, BEA, AMD, NetApp, NEC, Compuware, Novell, Blackberry, TIBCO, SAS, Toshiba, Texas Instruments, Tsinghua University (Beijing), Wells Fargo, Honeywell, UBS, Credit Suisse, HSBC, Deutsche Bank, Barclays, State Street Corp, Bank of America and JPMorgan.

On May 27, 2004, JPMorgan's Jamie Dimon issued a $10 billion line of credit to IBM (Mark Loughridge) while Goldman Sachs arranged debt financing for Lenovo, Beijing, China. This meant that an underwriter engaged in double-dealing on both sides of the IBM sale of the PC group to Lenovo on Dec. 8, 2004. IBM. (Jun. 30, 2004). Form 10-Q. SEC a04-7971_110q, p. 17, fn. 12 ("On May 27, 2004, IBM completed the renegotiation of a new $10 billion 5-year Credit Agreement with JPMorgan Chase Bank, as Administrative Agent, and Citibank, N.A., as Syndication Agent, replacing credit agreements of $8 billion (5-year) and $2 billion (364 day).) The Court must take judicial notice of the text of the Credit Agreement in its entirety.

 IBM started using the term "The Internet of Things" and cloud computing in about 2009. Today, this theme dominates IBM's market push based on Dr. Arunachalam's inventions. The U.S. Government  is essentially using the power of the presidency to promote IBM in evident violation of the ethics rules, namely the Standards of Ethical Conduct for Employees of the Executive Branch  (Subpart D - Conflicting Financial Interests, and Subpart E - Impartiality in Performing Official Duties).

O. **Andrews' actions dramatically prejudiced Dr. Arunachalam's lawsuit against JPMorgan, Fulton Bank, Fremont Bank and Pazuniak et al. He and Judge Robinson engaged in racketeering with JPMorgan and IBM in allowing JPMorgan's tampering with its expert witness.**

The law is clear:

> "Whoever corruptly--. . . (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1512(c).

JPMorgan had its expert witness lie that the patents do not disclose POSvc application nor VAN switch. Applications have existed in the Back Office of Banks and enterprises for eons of years. It has never been the goal of the patents to teach applications that have existed in Banks for eons of years. VAN switch has been clearly taught in the specification and in the prosecution history.

Andrews willfully obstructed justice by colluding with JPMorgan in not allowing Dr. Arunachalam a chance to demonstrate that the Court ruled against Dr. Arunachalam despite the fact that JPMorgan did not provide "clear and convincing evidence" as required by Sec. 282 of the Patent Act.

**JPMorgan, Wells Fargo, SAP, Citi Bank, Andrews  willfully omit** that Dr. Arunachalam's priority provisional application S/N60/006,634 (**Exh H** pp. 4-5) distinguishes between a valued-added service network, from a facilities network, gives analogy with telephone service network, that physical poles and cables of a phone network is the facilities network, that the voice service network is the application network that delivers voice services, that voice is the value-added network service or VAN service.

> "…Web evolving as…medium for electronic commerce (EC), new value - added network (VAN) services are expected to emerge… simple telephone call is…well - known example of a value - added network service…telephone network has two different but interrelated aspects: In terms of its physical components, it is a "facilities network." In terms of the varieties of VAN services that it provides, it is a set of many "traffic networks", each representing a particular interconnection of facilities. Traffic is the flow of multi – media information through the network…consider, for example, a simple transaction of daily commerce, such as ordering and paying for pizza, or home banking, or payroll services for businesses from banks, offered as a VAN service. The Internet, like the telecommunications network, is a system of interconnected facilities that could carry traffic from a variety of EC services. From the perspective of its physical components, the "Facilities Network" for EC exists today…There is no direct access to the end user from the VAN service providers, such as a Bank. There are some missing elements needed to capture and control the end user environment. The "Traffic Network" is THE challenge." (Exh H pp 4-5)

Plaintiff already disclosed in the patent specifications that Ethernet cord and OSI network layer router or switch (col. 5) are examples of a facilities network, which is a TCP/IP-based (cols. 5-6) network with physical hardware components. Example of a value-added service network over the Web is a Web banking application network.

**JPMorgan, Wells Fargo, SAP, Citi Bank, Andrews  willfully omit** that the specification (1) distinguished between the network layer vs application layer, (*see* cols. 4-5 and Fig. 3) which defines clearly the **metes and bounds** of what the structure is; (2) evidences that any ambiguity has been resolved by the specification disclosing a metric that distinguishes the value-added service network as an application network including the application displayed on a Web browser limitation and the distinction from a facilities network, which is a TCP/IP-based physical Internet or Web.  *Halliburton Energy Servs.,* 514F.3d,1255-56,85USPQ2d,1663 "…quantitative metric (e.g…limitation as to a physical property) rather than a qualitative functional feature"); (3) provide[s] a formula for calculating a property "along with examples that meet the claim limitation and examples that do not;"  (4) discloses a "value-added service network" which is an OSI layer 7 application network  that includes an application displayed on a Web browser (**providing examples** of such a "value-added service network" **meeting the claim limitation**, eg, Web banking network, that includes a Web banking application displayed on a Web browser, Figs 6A,5D, 5C)  and is distinct from a facilities network, an IP-based facilities network, which only goes up to layer 4 of the OSI model, such as the physical Internet and the Web. POSvc application is a term coined by the inventor and can only take on the meaning ascribed to it by the inventor and is not indefinite; (5)  **provides examples that do not meet the claim limitation** as in cols. 5-6,  of an IP-based facilities network as in col. 5,  such as the Internet, Web... (*id.* 1256, 85 USPQ2d at 1663 (citing *Oakley, Inc. v. Sunglass Hut Int'l,* 316F.3d 1331,1341,65 USPQ2d1321,1326 (Fed. Cir. 2003)).  "Dialing into the bank via a modem line" is an example of a facilities network;

> "…user **100**… **dialing into the bank via a modem line**. If user **100** is a Web user…no current mechanism for performing…real-time transaction with the bank, as illustrated in FIG. 4A … bank…unable to be a true "Web merchant," namely a **merchant capable of providing complete transactional services on the Web**." (col. 5)

(8)     provides a general **guideline and examples sufficient** to **teach a person skilled in the art when the claim limitation was satisfied** (see *Marosi,* 710 F.2d at 803, 218 USPQ at 292);

(9)     demonstrates that the **boundaries of the claim term in the claim as a whole are clear and precise**, upon primary inquiry as to whether the language leaves room for ambiguity or whether the boundaries are clear and precise.

The Delaware District Court construed "VAN service provider" as a provider of a POSvc application. The Court ***must*** construe "value-added service network" consistent with "VAN service provider" "value-added network" and "VAN service."   PTAB construed it as "a network on which services, other than underlying network communication services, are provided." Patent Owner ("PO") construed it as "an OSI application layer network running on top of a facilities network and that provides value-added network services (VAN services)." Prelim. Resp. 18. "**VAN Services**" are "applications displayed on a Web browser, that provides a value-add to the network," (eg, Web banking application is an example of a value-add to the network.) A "**facilities network**" is "an IP-based network with physical hardware components that provides underlying network communication services up to layer 4 of the OSI model."  This construction for "service network," "Value-added Service Network" is consistent with PO's construction of VAN service provider and also the specification.  PTAB construed it similarly, distinguishing between a facilities network (which provides the underlying network services from layers 1-4 of the OSI model) and a "service network,"  "Value-added Service Network" which provides the value-added services like Web banking, consistent with the specification (col. 6). PTAB acknowledges that a service network includes an Exchange which <u>displays</u> a <u>Web page **505** that includes applications **510**</u>.  (col. 5): "Five components interact to provide this <u>service network</u> functionality, namely, <u>exchange</u>, … graphical user interface." The specification discloses that <u>a necessary component of</u>

a service network or "Value-added Service Network" is an application displayed on a Web browser and that the service network or "Value-added Service Network" is an OSI application layer network running on top of a TCP/IP-based facilities network, such as the Web, the physical Internet, or email networks, as PTAB acknowledged. (cols. 5-6)  The service network or "Value-added Service Network" delivers VAN services or applications displayed on a Web browser. (col. 9).  PTAB acknowledged in IPR2013-00194, IPR2013-00195, CBM2013-00013 and CBM2014-00018 that a service other than an underlying service is an application like the Bank POSvc application. PTAB itself has defined what "value-add" means, that it is a "service other than an underlying service is an application like the Bank POSvc application." PTAB acknowledged what VAN services means. VAN service is a term coined by the inventor, just as POSvc application is a term coined by the inventor and can only take on the meaning ascribed to these terms in the specification or prosecution history by the inventor. Application service **704** and VAN service **704** are one and the same as disclosed in the specification. The specification at col. 2 discloses "application" or "service." So VAN services are applications displayed on a Web page or Web browser.

**P.  Andrews and SAP, JPMorgan, Wells Fargo Bank, CitiBank's  willful omissions, obstruction of justice, allegations about Dr. Arunachalam and her patents    and terrorizing Dr. Arunachalam (Exh. K)  mask racketeering evident from SAP's founding role (2001)  in the IBM Eclipse Foundation, hijacking Dr. Arunachalam's  inventions that created the  millennial  generation (Exh. J: eclipse.org, members, Eclipse code which includes said inventions)**

Andrews colluded with SAP, JPMorgan, Wells Fargo Bank, CitiBank, Fulton Bank, IBM's customers, and  obstructed justice involving  multiple parties thus denying Dr. Arunachalam a due process hearing, without giving a chance to be heard nor being given a fair chance and due process by the Courts, using  counterfeit logic to manufacture false allegations about Dr. Arunachalam and her patents that  masks violation of U.S. laws and misrepresentation by individual lawyers, expert

witnesses, judges, PTAB, enterprises and their employees, that has caused great personal  and financial injury to Dr. Arunachalam.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **DR. LAKSHMI ARUNACHALAM,** | |
| **Plaintiff,** | **C.A. No. 1:16-cv-281-RGA** |
| **v.** | **FIRST AMENDED COMPLAINT** |
| **INTERNATIONAL BUSINESS MACHINES CORPORATION, SAP AMERICA, INC., J.P. MORGAN CHASE AND COMPANY, HON. RICHARD G. ANDREWS, AND DOES 1-100,** | **JURY TRIAL DEMANDED** **18 U. S. C. 1961 et seq.; 18 U. S. C. 1964 (Civil RICO Remedies);** |
| **Defendants.** | |

## DECLARATION OF DR. LAKSHMI ARUNACHALAM IN SUPPORT OF FIRST AMENDED COMPLAINT

I, LAKSHMI ARUNACHALAM, declare:

I am the inventor and assignee of the U.S. Patent No. 7,340,506/US 7,340,506 C1 that has re-emerged successfully from an *inter-partes* re-examination by the United States Patent and Trademark Office initiated by Microsoft, and also of the prior patents-in-suit in the JPMorgan case 1:12-cv-282 (D.Del.), all of which derive their priority date from my provisional patent application with S/N 60/006,634 filed November 13, 1995. I reside at 222 Stanford Avenue, Menlo Park, CA 94025. I am *pro se* Plaintiff in the above-captioned action. I make this declaration based on personal knowledge and, if called upon to do so, could testify competently thereto.

1. Attached as **Exhibit A1** is a true and correct copy of Dr. Arunachalam's patent, U.S. Patent No. 7,340,506.

2. Attached as **Exhibit B1** is a true and correct copy of Inter Partes Re-examination Certificate for Dr. Arunachalam's re-examined and re-issued patent, U.S. Patent No. 7,340,506C1.

3. Attached as **Exhibit A2** is a true and correct copy of a partial list of RICO Predicate Acts by IBM, SAP, JPMorgan and Defendant Judge Andrews and additional background.

4. Attached as **Exhibit C1 is** a true and correct copy of a partial list of Documented Retaliations which Plaintiff had suffered *prior* to the date on which this federal case was first filed (April 18, 2016.)

5. Attached as **Exhibit D1 is** a true and correct copy of a subset of those Documented Retaliations which also qualify as one or more of the RICO Predicate Acts that are itemized at 18 U. S. C. §§ 1961(1)(B), (1)(D), and (5).

6. Attached as **Exhibit D2 is** a true and correct copy of CPL Agreement of Eclipse code, which shows IBM-SAP collusion from the Eclipse website. These documents are true and accurate copies of files downloaded from www.eclipse.org on April 18, 2016: 2002-08-29 Common Public License (CPL) Version 0.5 http://www.eclipse.org/legal/cpl-v05.html ; 2004-09-02 Tentative IP Log for eclipse.platform, eclipse.jdt and eclipse.pde http://www.eclipse.org/projects/ip_log.php?projectid=eclipse.platform,eclipse.jdt,eclipse.pde ; and 2004-09-02 Eclipse CPL to EPL Transition Plan http://www.eclipse.org/legal/cpl2epl/

7. Attached as **Exhibit D3** is a true and correct copy of a partial list of RICO Predicate Acts by Defendant Andrews and a partial list of Documented Retaliations which Plaintiff had suffered *prior* to the date on which this federal case was first filed (April 18, 2016.)

8. Attached as **Exhibit A** is a true and correct copy of Judge William Alsup's Order in Case No. C 08-05149 WHA (N. Dt. CA) on February 17, 2009.

9. Attached as **Exhibit B** is a true and correct copy of April 5, 2016 Federal Circuit ("CAFC") Ruling  in Case 14-1562, *Cardpool, Inc. v. Plastic Jungle, Inc*.

10. Attached as **Exhibit C** is a true and correct copy of the Mandate issued on July 24, 2015 in CAFC Case No. 14-1495, *JPMorgan v. Dr. Arunachalam and Pi-Net International, Inc.*

11. Attached as **Exhibit D** is a true and correct copy of CAFC's Order denying *en banc* rehearing issued in June 2015 in CAFC Case No. 14-1495, *JPMorgan v. Dr. Arunachalam and Pi-Net International, Inc.*

12. Attached as **Exhibit E** is a true and correct copy of U.S. Supreme Court's Letter to CAFC on Order denying rehearing of Dr. Arunachalam's Petition for Writ of Certiorari in Case No. 15-691.

13. Attached as **Exhibit F** is a true and correct copy of Claims 14, 20 and 21 in U.S. Patent No. 7,340,506/US 7,340,506 C1.

14. Attached as **Exhibit G** is a true and correct copy of excerpts pp. 175-181, 189-191 of the prosecution history of the related U.S. Patent No. 6,212,556, the ('556) patent in the same priority chain as the '506 patent.

15. Attached as **Exhibit H** is a true and correct copy of pp 1-5 of the parent provisional patent application with S/N 60/006,634 filed November 13, 1995.

16. Attached as Exhibit **I** is a true and correct copy of excerpts pp 82-93 from the prosecution history of the parent U.S. Patent No. 5,778,178, the ('178) patent in the same priority chain as the '506 patent.

17. Attached as **Exhibit J** is a true and correct copy of the web page for eclipse.org where Eclipse code is available for download including Plaintiff's inventions; list of members showing SAP, JPMorgan, IBM as members; board of directors showing SAP as a Board member; board meeting minutes of Dec 8, 2004 showing SAP's lead role; Eclipse awarded JPMorgan "Best Deployment of Eclipse Technology in an enterprise" at EclipseCon March 6, 2007; article entitled "JPMorgan raises the Bar for Banking Applications;" Amendment No. 8 to Form S-1 Registration statement for Facebook, Inc. showing JPMorgan, BofA, Barclays, Citigroup, Wells Fargo; and list of tutorials, sample code on Eclipse SOAP, REST, OData services from SAP.

18. I also certify that that the eclipse code, all versions, including version 2.0.1 is available for download at www.eclipse.org.

19. Attached as **Exhibit K** is a true and correct copy of letter from SAP's counsel Greg Lanier to Dr. Arunachalam, terrorizing her on April 8, 2016.

I declare under the penalty of perjury under the laws of the United States and the State of California and Delaware that the foregoing is true and correct. Executed this 13th day of May, 2016 in Menlo Park, California.

222 Stanford Avenue
Menlo Park, CA 94025       Dr. Lakshmi Arunachalam
650 690 0995, laks22002@yahoo.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DR. LAKSHMI ARUNACHALAM, | |
| Plaintiff, | |
| v. | C.A. No. <u>1:16-cv-281-RGA</u> |
| | **FIRST AMENDED COMPLAINT** |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, SAP AMERICA, INC., J.P. MORGAN CHASE AND COMPANY, HON. RICHARD G. ANDREWS, AND DOES 1-100, | **JURY TRIAL DEMANDED** **18 U. S. C. 1961 et seq.;** **18 U. S. C. 1964** **(Civil RICO Remedies);** |
| Defendants. | |

## CERTIFICATE OF MAILING

I, Dr. Lakshmi Arunachalam, hereby certify that on May 13, 2016, I filed an original and five copies of the attached "FIRST AMENDED COMPLAINT," Dr. Arunachalam's Declaration and Verification in support thereof, and Exhibits A2, C1, D1, D2, D3, A1, B1, and A-K, and eight copies of Form AO-440, Summons in a Civil Action with the Clerk of the Court, U.S. District Court for the District of Delaware by sending it to Parcels Inc of Wilmington Delaware to deliver it on the morning of May 13, 2016 for filing and docketing in this case to:

Clerk of Court
U.S. District Court for the District of Delaware,
844 N. King Street, Unit 18,
Wilmington, DE 19801.

*Lakshmi Arunachalam*

DATED: May 13, 2016

Dr. Lakshmi Arunachalam
222 Stanford Avenue
Menlo Park, CA 94025
650 690 0995
laks22002@yahoo.com

[i] *1. Bryn Mar. Ltd v. Carlton Browne and Co., Inc.,* No. 82-0696-E (S.D. Cal. 1983).

[ii] *United States v. Cauble,* 706 F.2d 1322 (5th Cir.), *cert den.,* 465 U.S. 1005 (1983)

[iii] *See In re American Honda Motor Co., Inc. Dealerships Relations Litigation,* 941 F.Supp. 528, *555* (D. Md. 1996) (adopting *Moffat* 's reasoning that 1962(a) and (b) properly apply to activities in the nature of acquiring a proprietary stake in an enterprise, not simply obtaining some influence over discretionary activities); *Moffat Enterprises, Inc. v. Borden, Inc.* 763 F. Supp. 143 (W.D. Pa. 1990).

[iv] *State v. Nine Say. Accounts, 553* So. 2d 823 (La. 1989); *Guerro v. Katzen,* 571 F. Supp. 714 (D.C. Cir. 1983).

[v] *O'Brien v. Dean Witter Reynolds, Inc.* 1984 WL 608 (D. Ariz. 1984).

[vi] *Sutliff Inc. v. Donavan Companies, Inc.,* 727 F.2d 648 (7th Cir. 1984) (criticized on other grounds by *Rose v. Mony Life Ins.,* 82 F. Supp. 2d 920, 924 (N.D. Ill. 2000)).

[vii] *US. v. Campione,* 942 F.2d 429, 438 (7th Cir. 1991)

[viii] *In Re Sahien & Assoc., Inc. Securities Litigation,* 773 F. Supp. 342 (S.D. Fla. 1991). *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258 (3d. Cir. 1995) (holding that in order to prove aiding and abetting in predicate act party must show that the defendant alleged to have aided and abetted the act knew of the commission of the act and acted with intent to facilitate it).